**ABBOTT LABORATORIES, an Illinois corporation, Counter–Defendant,**

v.

**ALPHA THERAPEUTIC CORPORATION, a California Corporation, and the Green Cross Corporation, a Japanese Corporation, a.k.a. Welfide Corporation, a Japanese Corporation, Counter–Plaintiffs.**

No. 97 C 1292.

United States District Court,
N.D. Illinois,
Eastern Division.

March 12, 2001.

 

Kimball R. Anderson, Winston & Strawn, Chicago, IL, Sharon E. Jones, Abbott Laboratories, Abbott Park, IL, for plaintiff.

Steven J. Roeder, Williams Montgomery & John Ltd., Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

BOBRICK, United States Magistrate Judge.

Before the Court is ABBOTT LABORATORIES' MOTION TO COMPEL DOCUMENTS RELATING TO INDEMNIFICATION CLAIMS, in which Abbott Laboratories, counter-defendant ("Abbott") seeks to compel Alpha Therapeutic and Green Cross Corporation (collectively, "Alpha") to produce any and all documents related to the claims for which Alpha and Green Cross seek indemnification from Abbott, including attorney-client communications and attorney work product.

## I. INTRODUCTION

On July 28, 1978, Abbott and Alpha, along with Alpha's parent corporation, Green Cross, entered into an Asset Acquisition Agreement under which Abbott sold to Alpha certain assets comprising the Abbott Scientific Products Division ("ASPD"). Abbott had previously used the ASPD to manufacture and sell blood products, including products commonly used to treat hemophilia called "factor concentrate." Under the terms of the Agreement, Abbott transferred certain inventories of blood products including the factor concentrate, the ASPD records, and employees to Alpha.

The Agreement provided that Abbott indemnify Alpha against all claims arising from the use by any person of any inventory obtained by Alpha directly or indirectly from Abbott prior to August 15, 1978, or obtained directly or indirectly by Alpha but owned by Abbott prior to the closing of the contract. That provision of the Agreement (hereinafter, the "Agreement" or "Asset Acquisition Agreement") also provided that Abbott would *not* be forced to indemnify Alpha for claims arising out of the use of product transferred from Abbott to the extent that such claims had their origins in Alpha's own negligence. *See,* Section 7.01 of Asset Acquisition Agreement.[1]

The Agreement in § 7.14 also contained a choice of law provision which stipulated that the contract was governed by California law except as to matters required to be governed by the laws of another jurisdiction. Further, the Agreement included a "Cooperation in Connection with Indemnification" provision under which Alpha was obligated to make available to Abbott at all times all business records related to any suit underlying a claim for indemnification from Abbott, and that Alpha would render all reasonably required assistance in order to assure the proper handling of such suits. *See, Id.* at § 7.02.

A few years subsequent to the transfer of assets between the parties, which included transfer of factor concentrate, hemophiliacs began dying of HIV/AIDS. After a link was drawn between HIV/AIDS infection and use of fractionated blood products, hemophiliacs who had used Alpha's products and contracted the disease began to sue Alpha. Alpha defended and in many cases settled these claims.

Pursuant to the terms of the Agreement, in 1996 both parties first attempted to negotiate a settlement with respect to indemnification by Abbott for the costs of defending and settling the underlying hemophiliac law suits. When the negotiations broke down Abbott filed a declaratory judgment action with this Court seeking a determination of the parties respective rights and obligations under the Agreement and specifically, a determination that a settlement had been reached during the negotiations. Alpha answered stating that no such settlement regarding indemnification had been reached and counterclaimed seeking, *inter alia,* declaratory relief and breach of contract. The

---

1. § 7.01, 7.02 and 7.14 of the Agreement are    attached to this Order.

question of the existence of a binding settlement agreement, resulting from the negotiations between the parties, was resolved by the Seventh Circuit holding that no settlement agreement had been reached. *Abbott Laboratories v. Alpha Therapeutic Corp.*, 164 F.3d 385 (7th Cir.1999). The parties have subsequently continued the indemnification litigation to determine their respective rights and obligations under the Asset Acquisition Agreement and have become embroiled in discovery dispute after discovery dispute, the latest of which is presently before this Court.

In Abbott's present Motion to Compel Documents Relating to Indemnification Claims, Abbott has asked this Court to order Alpha to produce certain documents that relate "to Alpha's legal analysis of its actual or potential liability to hemophiliacs infected with viruses carried by Alpha or Green Cross blood factor products." *Abbott's Motion to Compel*, at ¶ 3.[2] In its motion Abbott contends that the attorney-client privilege and attorney work product doctrine do not apply to this case and thus Alpha cannot rely on these privileges to shield the documents from disclosure. Abbott also posits as an alternative argument that, should this Court determine that the privileges are applicable, Alpha has waived the privileges by "seeking indemnification from Abbott,... by invoking the advice of counsel defense, by its voluntary production of supposedly privileged documents, and having... [Alpha's] General Counsel Edward Colton testify for two days at a videotaped deposition about the documents that Alpha claims are privileged." *Abbott's Motion to Compel*, at ¶ 3.

Alpha, on the other hand, has argued that the documents at issue are precisely the type of communications that the attorney-client and attorney work product privileges were designed to protect against disclosure. "A hornbook could not provide better examples of protected communications and work-prod-

uct than those Abbott seeks with its motion." *Alpha's Response to Abbott's Motion to Compel*, at 2. Alpha also urges that it has in no way waived these privileges with respect to the requested documents.

## II. *ANALYSIS*

### A. *Applicable Law*

■ Under Federal Rule of Evidence 501, in civil actions or proceedings with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness shall be determined in accordance with State law. Fed.R.Evid. 501. In the instant case, jurisdiction is based on diversity of citizenship. Notwithstanding Alpha's contention that California law applies to this discovery dispute, pursuant to the governing law provision in the Agreement between the parties, Illinois law supplies the rule of decision regarding the attorney-client privilege. "A district court sitting in diversity applies the law of the state in which it sits regarding privilege." *ConAgra, Inc. v. Arkwright Mutual Ins. Co.*, 32 F.Supp.2d 1015, 1016 n. 3 (N.D.Ill.1999); *CSX Transportation, Inc. v. Lexington Ins. Co.*, 187 F.R.D. 555, 559 (N.D.Ill.1999); *See also, Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1097 (7th Cir.1987). Further, federal courts sitting in diversity cases will apply the choice of law rules emanating from the state in which they sit. *See, Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). As Abbott pointed out in an earlier memorandum of law that has been incorporated into its present motion, "the choice of law rules determine whether Illinois or California law applies to privilege." *Abbott's Motion to Compel*, Exhibit 7 at 9. Abbott further points to a Northern District of Illinois case that clearly states the position of Illinois courts on choice of law with regard to privilege. "Federal courts have held that under Rule 501, [of Fed.R.Evid.] a district

**2.** Specifically, Abbott requests the Court to order Alpha to produce documents that, "include but are not limited to... any communications with attorneys regarding HIV/AIDS in hemophiliacs (or the potential therefor); any communications between Alpha (and/or Alpha attorneys) and its insurance company(ies) regarding the underlying HIV/AIDS hemophiliac litigation (or the poten-

tial therefor); Alpha's legal files concerning the underlying HIV/AIDS hemophiliac litigation (or the potential therefor); and any other documents that relate to the underlying HIV/AIDS litigation which Alpha may have previously withheld on a theory of attorney-client privilege and/or attorney work product." *Id.* at note 2.

court exercising diversity jurisdiction must apply the law of privilege which would be applied by the courts of the state in which it sits...[and] Illinois courts would hold...the attorney-client privilege claims are questions of discovery and evidence and that, in determining the scope and validity of the privilege claims, Illinois law governs." *Abbott Lab. v. Airco, Inc.*, 1985 WL 3596 (N.D.Ill.1985) (citations omitted). Interestingly, *Abbott v. Airco* also involved a contract containing a choice of law provision which selected New York law as the law governing the contract. That fact notwithstanding, the court there held that Illinois law is the applicable State law for construing the scope of the attorney-client privilege.

■ Claims of privilege under the attorney work product doctrine are, on the other hand, governed solely by federal law. "[T]he work-product doctrine is governed by a uniform federal standard even in diversity cases." *Dawson v. New York Life Ins. Co.*, 901 F.Supp. 1362, 1367 (N.D.Ill.1995). The work product doctrine has its origins in Federal Rule of Civil Procedure 26(b)(3) which, unlike Federal Rule of Evidence 501, contains no requirement that federal courts in diversity suits apply the privilege law of the state in which the federal court sits. Fed. R. Civ. Proc. 26(b)(3). We therefore hold that Illinois law is the law to be applied when discerning Alpha's claims of attorney-client privilege over the documents and federal law is to apply to Alpha's claims under the work-product doctrine.

**B. *Attorney–Client Privilege***

■ Having determined that Illinois choice of law rules will dictate the applicability of Illinois law to the construction of the attorney-client privilege asserted by Alpha, we next move to determine if Alpha can avail itself of the privilege as it has been defined by the Illinois courts. As recognized by both parties, *Waste Management, Inc. v. International Surplus Lines Ins. Co.* is the principle Illinois case construing the parameters of the attorney-client privilege in Illinois. 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991). In that case the Illinois Supreme Court issued several important pronounce-

ments regarding the purpose, nature, and scope of the privilege. "All matters that are privileged against disclosure,...including privileged communications between a party or his agent and the attorney for the party, are privileged against disclosure through any discovery procedure." *Waste Management*, 161 Ill.Dec. 774, 579 N.E.2d at 326. Further, the *Waste Management* Court observed, "[t]he purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information." *Id.* at 326–27. Finally, the Court indicated that it is the *privilege*, and not the duty to disclose information, that is the exception and that Illinois adheres to a strong policy of confining the privilege to its "narrowest possible limits" and to a policy of "encouraging disclosure, with an eye toward ascertaining that truth which is essential to the proper disposition of a lawsuit." *Id.* at 327.

Abbott first argues that *Waste Management* compels a finding that the attorney-client privilege does not apply to the documents at issue here because the *Waste Management* Court had found that the "cooperation clause" in the insurance contract between the parties was dispositive on the issue of whether certain documents were entitled to protection. In essence, Abbott argues that the "cooperation clause" in the Agreement between Abbott and Alpha is analogous to the "cooperation clause" in *Waste Management*, this being a sufficient basis to find the privilege inapplicable. *Id.* To discern whether the cooperation clause in the Abbott/Alpha Agreement is truly analogous to the one at issue in *Waste Management*, we must scrutinize the language of that clause. Section 7.02 of the Agreement, entitled, "Cooperation in Connection With Indemnification," states in relevant part: "Buyer [Alpha] shall make available to Seller [Abbott], its attorneys and accountants, at all reasonable times,... all books and records of the ASPD Business related to such [underlying] suit, claim or proceeding, and...[Alpha] and...[Abbott] will render to each other such assistance as they may reasonably require of each other in order to insure the proper and adequate defense of

any such suit, claim or proceeding." Section 7.02 of Asset Acquisition Agreement.

While the language quoted from the Agreement above does not specify attorney-client communication between Alpha and its lawyers regarding the conduct of the underlying litigation, it does impose the same "broad duty of cooperation...without limitation or qualification," as the *Waste Management* Court found imposed on the insured by the terms of its insurance contract with the insurers. *Waste Management*, 161 Ill.Dec. 774, 579 N.E.2d at 328. Further, *Waste Management* states that a duty of cooperation extends at least to the point where the insurer is requested to perform its end of the bargain. *Id.*

Alpha's attempt to distinguish *Waste Management* on its facts is unpersuasive. Alpha contends that the relationship between insurer and insured is "drastically different from this Alpha/Abbott dispute." *See, Alpha's Response* at 6. But, instead of offering a precise reason why the relationship between the parties here is so drastically different to the parties in *Waste Management*, Alpha launches into a discussion of the common interest doctrine (addressed below) which accomplishes little in distinguishing the facts of *Waste Management*. Alpha is correct when it states that the relationship between the parties in *Waste Management* was of fundamental importance to the Court's determination of the inapplicability of the attorney-client privilege. *See, Waste Management*, 161 Ill.Dec. 774, 579 N.E.2d at 327–9. This Court, however, fails to see the drastic difference between that relationship and the one presented by this case. In *Waste Management* there was an insurance contract which provided for indemnity (or coverage) of the insured in the event of incurring certain liability. *Id.* at 324–25. Likewise, in the instant case there is a contract which provides for indemnity of Alpha by Abbott in the event Alpha incurs liability related to the assets acquired from Abbott. In *Waste Management*, the insurer, who did not participate in the underlying litigation for which the insured sought indemnification, denied coverage to the insured. *Id.* Here, also, Abbott (like the insurer in *Waste Management*) did not participate in the underlying litigation, and refused to indemnify Alpha for its costs in defending and settling the underlying claims. In short, this Court can discern no difference in the relationships between the parties in *Waste Management* and this case material enough to militate a different finding here than the Illinois Supreme Court found there. While it is not an identical relationship, for purposes of indemnity, Abbott indeed appears as an insurer which has, in effect, "denied coverage." A suit to determine the rights and liabilities of the parties under an insurance policy, as was the case in *Waste Management*, is essentially the same as a suit to determine rights and obligations under an indemnification clause of a contract for the sale of assets.

Alpha relies heavily on an Illinois Supreme Court's holding, that came after the *Waste Management* decision, in which the Court found the sought-after documents to be under the protection of the attorney-client privilege. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill.2d 579, 244 Ill.Dec. 941, 727 N.E.2d 240 (2000). But that case is far less analogous to the instant case than is *Waste Management*. The *Fischel & Kahn* attorneys filed a complaint against a client (an art gallery) for the payment of legal fees; the client in turn counterclaimed for malpractice stemming from advice furnished by the law firm regarding consignment art contracts. *Fischel & Kahn*, 244 Ill.Dec. 941, 727 N.E.2d at 242. The underlying litigation in *Fischel & Kahn* involved claims brought by, among others, artists whose consignment works were destroyed, along with the entire inventory of the gallery, in a fire at the gallery. *Id.* The client had retained a different law firm from the Fischel firm to represent it in the fire loss litigation. *Id.* Pursuant to the malpractice counterclaim, Fischel & Kahn requested communications between the former client and its attorneys in the fire loss litigation. *Id.* at 243. Because the gallery was claiming damages from the defense and settlement of the underlying litigation on the basis of negligent representation of the gallery, the counter-defendant law firm believed the communications between the gallery and the attorneys who handled the fire loss claims were central to their defense. *Id.*

The Illinois Supreme Court disagreed and found that the communications sought were protected by the attorney-client privilege and that the privilege had not been waived by pursuing the malpractice claim. *Id.* at 246.

Again, there are strong indications throughout the *Fischel & Kahn* opinion, as in *Waste Management,* that the relationship between the parties impacted the Court's decision. The present case is quite different from *Fischel & Kahn.* In the present case, Abbott seeks basic communications between Alpha and its lawyers and insurance company(ies) regarding the defense and settlement of claims for which it now is being asked to pay pursuant to a contract between the parties. In addition, the contract in the present situation provides for cooperation between the parties with respect to indemnification of claims. The Court in *Fischel & Kahn* made no mention of a contract between the parties as having impacted its decision to preserve the attorney-client privilege, and thus the relationship between the parties in *Fischel & Kahn* is far less analogous and "drastically different" from that between Abbott and Alpha.

### C. *Common Interest Doctrine*

■ The *Waste Management* Court found application of the so-called common interest doctrine as an independently sufficient ground for holding the attorney-client privilege inapplicable. *Waste Management,* 161 Ill.Dec. 774, 579 N.E.2d at 328–29. This doctrine holds the attorney-client privilege inapplicable to situations where an attorney acts for two different parties who have common interests. The communications by either party to the attorney are not necessarily privileged in a subsequent controversy between the two parties. *Id.* at 328 (citing Graham, Cleary & Graham's Handbook of Illinois Evidence (5th ed.1990); McCormick, Evidence (3rd ed.1984); 8 J. Wigmore, Evidence (McNaughton rev.1961)). Recognizing that the insurer and insured had a common interest in the favorable resolution of the underlying claims, the Court held that the communications between the insured and its defense counsel, who was neither retained nor in direct communication with the insurer, were "of the kind reasonably calculated to protect or to further those common interests." *Id.* Further, in regards to the fact that the *Waste Management* situation did not involve one attorney who acts for two clients, the Court stated, "...we believe that the doctrine may properly be applied where the attorney, though neither retained nor in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer." *Id.* at 329.

■ This is precisely the present situation. Alpha's attorneys in the underlying litigation were, in effect, representing both the interests of Alpha and Abbott, as Abbott could ultimately be found liable for the claims pursuant to its agreement to indemnify. The fact that the parties no longer have such a *common interest (since becoming adversaries* regarding indemnification, as evidenced by this litigation) is of no consequence to the privilege as applied to the documents presently sought by Abbott, as those documents relate to the underlying claims. Indeed, Alpha even recognizes that the parties have, or at one time had, a common interest in resisting claims brought by hemophiliacs. *See, Alpha's Response at 6.* Alpha's contention that by seeking to prove Alpha's contributory negligence, Abbott has destroyed any common interest, misapprehends the common interest doctrine itself and as applied in *Waste Management.* While the common interests that existed at the time of the hemophiliac litigation may not *presently* exist, those interests did in fact exist for at least some of the time during the conduct of the underlying litigation, and at those times the attorneys for Alpha could be said to have been acting in the common interest of both Alpha and Abbott. In sum, the holding of *Waste Management* regarding the common interest doctrine applies to this case and renders the attorney-client privilege inapplicable to the subject documents.

It must be noted, however, that the *Waste Management* holding regarding the common interest doctrine does not extend to communications between Alpha and its attorneys addressing the adversarial relationship that now exists between Abbott and Alpha, either during the conduct of the underlying litigation or subsequent to it. "No common inter-

est existed as to issues regarding possible denial of coverage [or refusal to indemnify], regardless of whether they arose during the underlying litigation." *CSX Transportation, Inc.*, 187 F.R.D. at 560. Thus, while Alpha is barred from claiming attorney-client privilege for communications dealing with its conduct of the underlying hemophiliac litigation, to the extent that such communications deal with issues of indemnification by Abbott, Alpha may redact those portions of the communications.

We find the attorney-client privilege inapplicable to the discovery sought by Abbott under Alpha's contractual obligation to cooperate and under the common interest doctrine as construed by the Illinois Supreme Court in *Waste Management.* 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322. This does not, however, end our analysis as Alpha has also claimed that the documents sought by Abbott are also protected from disclosure under the attorney work product doctrine.

### D. *Attorney Work Product*

At the outset, it is noted that Alpha relies on *Fischel & Kahn, Ltd. v. Van Straaten Gallery,* Inc. for its analysis of the issue of attorney work product protection against disclosure. Alpha's reliance is misplaced as that case construes the Illinois state rule covering the protection of attorney work product and, as noted above, the source for attorney work product protection is Federal Rule of Civil Procedure 26(b)(3) which contains no instruction to revert to state rules of decision. *See, LaSalle National Trust v. Jerry Schaffner, et al.,* 1993 WL 105422 *5–6, 1993 U.S. Dist. LEXIS 4410, *17–*18 (N.D.Ill.1993) (citing, *A.O. Smith Corp. v. Lewis, Overbeck & Furman,* 1991 WL 192200 (N.D.Ill.1991)).

■ The work product doctrine has its origins in the seminal case of *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947) and was subsequently codified in Federal Rule of Civil Procedure 26(b)(3). The rule protects from disclosure material "prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, in-

demnitor, insurer or agent)..." Fed. R. Civ. Proc. 26(b)(3). The attorney work product doctrine is "distinct from and broader than the attorney-client privilege." *Coltec Industries, Inc. v. American Motorists Ins.,* 197 F.R.D. 368, 371 (N.D.Il.2000) *United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975). The purpose of shielding attorney work product from disclosure is to protect "the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits." *Certain Underwriters at Lloyds et al. v. The Fidelity and Casualty Co. of New York,* 1997 WL 769467, *3, 1997 U.S. Dist. LEXIS 19670, *8–*9 (N.D.Ill.1997)(citing *Hickman,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451); *See also, Binks Mfg. Co. v. National Presto Indus.,* 709 F.2d 1109, 1118 (7th Cir.1983). In addition, work product protection against disclosure, "applies to documents prepared by either the *client or attorney* 'prepared in anticipation of litigation or for trial.'" *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989,* 133 F.R.D. 515, 519 (N.D.Ill.1990)(emphasis added)(citing Fed. R.Civ.P. 26(b)(3); *Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141; *In re Special September 1978 Grand Jury,* 640 F.2d 49 (7th Cir.1980)).

Most courts have recognized a distinction (as does Rule 26) between ordinary work product and opinion work product and have taken the view that opinion work product, i.e., that work product that reveals an attorney's mental impressions, legal theories, conclusions, or opinions, can rarely, if ever, be discoverable. *See, Upjohn Co. v. United States,* 449 U.S. 383, 402, 101 S.Ct. 677, 689, 66 L.Ed.2d 584, 599 (1981); *Abbott Lab. v. Airco, Inc.,* 1985 WL 3596 at *3; *Frontier Refining, Inc. v. Gorman–Rupp Co. Inc.,* 136 F.3d 695, 704 (10th Cir.1998); *Dawson v. New York Life Ins. Co.,* 901 F.Supp. 1362, 1368 (N.D.Ill.1995). Indeed, this Court has iterated that work product "...consists of a multi-level protection whereby that information most closely related to an attorney's

litigation strategy is absolutely immune from discovery, while that information with a more tenuous relationship to litigation strategy might be available in circumstances evincing a substantial need or undue hardship on the part of the discovery proponent." *Dawson,* 901 F.Supp. at 1368. While Rule 26 does allow for discovery of ordinary work product upon a showing of substantial need and inability to obtain the information without undue hardship, discovery of opinion work product is not so allowed under Fed.R.Civ.P. 26(b)(3).[3]

In the case at bar, the threshold question under the work product protection doctrine is easily answered. The discovery opponent must first establish that the materials sought to be protected were prepared "in anticipation of litigation." *Binks,* 709 F.2d at 1118. The very description of the documents sought by Abbott plainly establishes that the documents were prepared either in anticipation of the hemophiliac litigation or during the ongoing defense in the litigation. *See, supra* n. 1. As such, we need not further expound on the various standards courts have applied to determine whether materials were prepared in anticipation of litigation, and indeed, it appears neither party has raised the issue.

The second inquiry is whether the materials sought by Abbott are ordinary work product, which could be obtained after a showing of substantial need and undue hardship, and that the materials sought did not qualify as opinion work product, the latter being near absolutely protected and discoverable only in very rare and extraordinary circumstances. *See, Minnesota Schl. Bd. Assoc. Ins. Trust v. Employers Ins. Co. of Wausau,* 183 F.R.D. 627, 630 (N.D.Ill.1999).

Abbott has clearly requested documents that would fall in both the category of opinion work product and the category of ordinary work product, and further, based on the description in the requests, it would seem that most documents contain both opinion and ordinary work product. It therefore is necessary to determine first, whether any principle under the particular facts of this case renders the work product doctrine inapplicable to the documents at issue and second, if work product protection is available, whether Alpha has waived its right to invoke it or whether Abbott has demonstrated a need for the documents that goes beyond the showing required for ordinary work product. As set forth more fully below, it appears that the cooperation clause in the Agreement renders work product protection inapplicable to this case and Alpha has indeed waived work product protection for the documents sought by affirmatively placing "at-issue" matters which require the disclosure of the documents to ascertain the disposition of those matters. *See, Lorenz,* 815 F.2d at 1098.

### E.  *Application and Waiver of Attorney Work Product*

Abbott argues that work product protection does not apply in this case due to Alpha's contractual obligations under the cooperation clause of the Agreement and, alternatively, if the doctrine does apply, Alpha has waived the protection on the basis that: Alpha seeks indemnification for the underlying hemophiliac claims; by invoking the advice of counsel defense; by voluntarily producing potentially work product protected documents that related to one hemophiliac claim; and by allowing the Alpha's General Counsel Edward Col-

---

**3.**  There is an evident split among Circuits on the particular question of whether opinion work product is absolutely immune from discovery or whether there are certain circumstances where such discovery should be available to the proponent. *Frontier Refining,* 136 F.3d at 704 n. 12; *Compare, Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573, 577 (9th Cir.1992)(holding that opinion work product may be discoverable in situations where mental impressions are at issue and proponent evinces a compelling need), *and In re Sealed Case,* 676 F.2d 793, 809–10 (D.C.Cir.1982)(holding that a showing of extraordinary justification is required before disclosure

of opinion work product is warranted), *with Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 509 F.2d 730, 735 (4th Cir.1974)(holding opinion work product to be absolutely immune from discovery). *Frontier Refining* also noted that the Supreme Court in *Upjohn* declined to decide whether any showing by the discovery proponent could overcome opinion work product protection but the Court did state that the showing of substantial need and undue hardship is insufficient to compel disclosure of opinion work product. *Frontier* Refining at 704 n. 12 (citing *Upjohn,* 449 U.S. at 401–02, 101 S.Ct. 677).

ton to testify extensively on the subject of documents which Alpha now contends are privileged.

In *LaSalle National Trust v. Schaffner,* this Court found that the common interest doctrine abrogated *opinion* work product protection between an insurer and insured "with respect to documents prepared solely for the underlying litigation." 1993 WL 105422 *6–7, 1993 U.S. Dist. LEXIS 4410 at *19–*20. Although cases from various circuits have also held that the common interest doctrine applies to work product immunity, there seems to be no case that precisely mimics the facts presented here. At this point there is no certainty that the common interest between Abbott and Alpha, that had its roots in successfully defending or defeating the underlying hemophiliac litigation, is sufficient to abrogate the work product protection claimed by Alpha. While that common interest is sufficient to render the attorney-client privilege inapplicable as set forth above, that reasoning is derived from Illinois common law and not from a federal standard which we must here apply. *But see, La Salle National,* 1993 WL 105422 *6–7, 1993 U.S.Dist. LEXIS 4410 at *19–*20 (acknowledging equal support for opposing propositions that common interest doctrine abrogates work product doctrine and finding that common interest doctrine indeed abrogated work product immunity but only as to documents prepared for underlying litigation).

■ There are, however, two more important reasons why work product protection is not available to Alpha in this case. First, just as is the case in the context of attorney-client privilege, Alpha is under a contractual obligation to cooperate with Abbott regarding claims asserted against Alpha for which Alpha may seek indemnification from Abbott. *See,* Attorney–Client Privilege Section above *supra;* Section 7.02 of Asset Acquisition Agreement. This broad duty undertaken by both parties cannot be ignored simply because the parties are now attempting to hash out which party should shoulder the liability incurred in the underlying litigation. The fact that the parties are now attempting to place liability upon each other for the hemophiliac suits highlights the importance of such a cooperation clause. It is indeed this very contingency for which cooperation clauses are inserted in contracts providing for indemnity: to assist the contracting parties in determining their respective rights and obligations when requesting or providing indemnity. Although the federal cases cited by Abbott in its Reply in Support of its Motion to Compel were applying Illinois law (under *Waste Management*) to determine the effect of the.cooperation clauses on the document requests, and those cases used other means by which to find work product protection inapplicable, this Court sees no apparent difference in applying the same reasoning with respect to cooperation clauses in the work product context. It would be inconsistent to find that the cooperation clause renders the attorney-client privilege inapplicable and simultaneously to imply that such a clause has no effect on the work product doctrine thereby allowing the party advocating non-disclosure to shield the information in spite of the broad duty of cooperation it has assumed. This Court thus finds that Alpha is contractually obligated to produce the documents Abbott has requested. *See, supra* n. 2.

■ Secondly, Alpha has waived attorney work product protection with respect to the document categories listed in Abbott's request by placing the subject matter of the documents at issue in this subsequent indemnification suit. "At-issue waiver can also apply to the protection afforded under the work-product doctrine." *Pyramid Controls, Inc. v. Siemens Industrial Automations, Inc., et al.,* 176 F.R.D. 269, 276 (N.D.Ill. 1997); *see also, A.O. Smith Corp.,* 1991 WL 192200, at *5; *Ins. Corp. of Ireland, Ltd. v. Bd. of Trustees of So. Ill. Univ.,* 937 F.2d 331, 334 n. 3 (7th Cir.1991). As the holder of the privilege, and not the discovery proponent, Alpha injected the issue that brought about the waiver of privilege. *See, Lorenz,* 815 F.2d at 1098. This is also a matter of common sense as it would be entirely unfair for a case to turn on an issue upon which one party has no knowledge and is barred from access to the necessary information while the other party is able to use the information to

establish its claim while shielding it from disclosure.

The issue in *Pyramid Controls* pertinent to our facts was whether the defendant was entitled to ostensibly work product protected communications where the plaintiff used its attorney's advice at a certain meeting to establish when it had first learned that the defendant's actions respecting a termination of a distributorship constituted a violation of the Illinois Franchise Disclosure Act. *Pyramid Controls*, 176 F.R.D. at 271. The Court found that "Pyramid had waived protection under the work-product doctrine...by putting at issue the discussions between itself and its attorney and the advice Pyramid received based on these discussions." *Id.* at 276. Specifically, because the defendant claimed that the statute of limitations had run, and the plaintiff responded to this claim by providing a date on which it became aware of the violation charged, through its attorneys, the plaintiff's communications with its attorney became a central issue in the case.

In *Lorenz*, the Seventh Circuit held that implicit waiver of privilege occurs "when a holder relies on a legal claim or defense, the truthful resolution of which will require examining confidential communications." 815 F.2d at 1098. That is exactly what is required in the instant case.

Alpha has defended and settled the underlying hemophiliac claims and has requested indemnification from Abbott under Abbott's contractual obligations for those defense and settlement costs. Abbott's contractual obligations are, however, not completely unrestricted by the contract terms. The Agreement specifically exempts Abbott from a duty to indemnify when Alpha's liability was caused by its own negligence. *See,* Section 7.01 of Asset Acquisition Agreement. The fact that under the Agreement Abbott's duty to indemnify is limited to certain circumstances, injects the issue of Alpha's negligence into this indemnification suit. Further, Alpha, the potential holder of work product protection, has injected the issue into the case by relying on the Agreement to support its indemnification claims. In short, issues surrounding the conduct of the under-

lying litigation are central to the question of whether Abbott should be forced pursuant to its contract obligations to indemnify Alpha. The documents relating to the conduct of the hemophiliac litigation produced by Alpha's attorneys are not only vital to Abbott's defense, they are indeed the only means by which Abbott can evaluate the validity of Alpha's claim for indemnification. The documents are the only source to determine the reasonableness of the defense and settlement costs for which Abbott is presently being asked to pay. Moreover, given that Abbott has claimed that the hemophiliac claims arose out of Alpha's negligence, and Alpha has conversely claimed that the liability it incurred stems from the assets acquired from Abbott, it is abundantly clear that the conduct of the defense, including documentation of the theories on which Alpha's attorneys relied, in the underlying lawsuits, is "at-issue." Alpha cannot assert a claim for indemnification of costs of defending a lawsuit without providing its indemnitor with documentation which proves the legitimacy of those indemnification claims.

## III. *CONCLUSION*

For the foregoing reasons, Abbott's Motion to Compel the Production of Documents Related to Indemnification Claims is GRANTED. Alpha is to provide documents to Abbott, consistent with this order, within 21 days. Alpha is given leave to redact from the produced documents any and all privileged communications regarding this litigation and the adversarial relationship that has developed between the parties.

## ARTICLE VII

### *CERTAIN PARTICULAR AGREEMENTS*

Section 7.01. *Indemnification of Buyer.* Seller shall defend, indemnify and hold Green Cross and Buyer harmless against and in respect of any and all loss, damage or deficiency, which is incurred or suffered by, asserted against, or imposed upon, Green Cross, Buyer, the Assets, or the properties or rights of Green Cross or Buyer, arising directly or indirectly from, on account of, or in connection with:

(a) *Liabilities.* Any liabilities of Seller not expressly assumed by Buyer pursuant to Section 2.03 hereof;

(b) *Sales of Inventory.* Sales by Seller on or prior to the Closing of any Inventory (including the H–BIG Assets) or, except to the extent caused by Buyer's negligence, sales by Buyer after the Closing of any such Inventory owned by Seller prior to the Closing;

(c) *Use of Inventory.* Use by any person of any of the Inventory (including the H–BIG Assets) obtained by them directly or indirectly from Seller, or obtained directly or indirectly from Buyer but owned by Seller prior to the Closing, except to the extent caused by Buyer's negligence;

(d) *Returned Inventory.* Returns of any ASPD Business product owned by Seller prior to the Closing, whether such returned goods were sold to the party returning same by Seller or by Buyer, unless caused by Buyer's negligence; provided, however, that Buyer shall not be obligated to, but may in its sole discretion, accept any such returned goods purchased from Seller if Buyer is in turn willing, to the extent necessary, to reimburse such purchaser or Seller, as the case may be, and thus acquire title to the returned goods;

(e) *Recalled Products or Inventory.* Recalls of any or all ASPD Business products or lines of products approved for sale as of December 31, 1977, or of any given lot or other portion of the Inventory (including the H–SIG Assets), whether or not all or any portion thereof shall have ever been sold or committed to be sold; provided, however, that Buyer shall not be obligated to, but may in its sole discretion, accept any such recalled goods in mitigation of the loss otherwise borne by Seller hereunder if Buyer is in turn willing to exonerate Seller from that portion of Seller's loss associated with such goods and thus acquire title to the goods recalled, or any portion thereof;

(f) *Losses From Misrepresentations or Breach of Seller's Obligations.* Any misrepresentation or breach of any representation or warranty of Seller made or contained in this Agreement, or in any certificate, exhibit, list or document executed and/or delivered or to be executed and/or delivered to Buyer under or in connection with this Agreement other than in any document evidencing a separate agreement;

(g) *Licenses.* Any and all suspensions, deferrals, withdrawals or other cancellations or restrictions upon the use of the licenses, consents, authorizations or permits granted by governmental authorities in connection with this transaction proximately caused by the actions of Seller;

(h) *Claims.* Any and all actions, suits, proceedings, claims, damages, assessments, judgments, costs, interest, penalties and expenses incident to any of the foregoing; provided, however that no such indemnification shall be so payable with respect to any such loss, damage or deficiency, claim, suit, obligation, or liability including, without limitation of the foregoing, reasonable attorneys' fees and other costs and expenses incident to any suit, action or proceeding, except to the extent that the aggregate amount of all such losses, damages, deficiencies, claims, suits, obligations and liabilities presented by Buyer to Seller shall first exceed, with respect to Inventories, Twenty–Five Thousand Dollars ($25,000) plus the amount of applicable reserves as of the Closing date used in computing Net Current Assets and, with respect to all other matters, One Hundred Seventy–Five Thousand Dollars ($175,000); provided, further, however, that the agreed indemnification payable hereunder by Seller for matters other than products liability claims and related liabilities shall not exceed the amount of the Purchase Price.

Section 7.02. *Cooperation in Connection With Indemnification.* Buyer will give prompt written notice to Seller of any claim against Seller or Buyer, of which Buyer receives notice after the Closing and which might give rise to a claim by Buyer against Seller under Section 7.01 hereof, stating the nature, basis and an estimate of the amount thereof. In the event that Buyer fails to give notice of any such claim within 120 days, and such failure to give notice within 120 days materially prejudices Seller in the defense of such claim, then the indemnification provided

for by Section 7.0 hereof shall not apply to the claim with respect to which Buyer so failed to give such notice. Seller shall have the right to be represented, at its own expense, by advisory counsel and accountants, in case of any suit, claim by any governmental body, or legal, administrative or arbitration proceeding with respect to which Seller may have liability under its indemnity agreement contained in Section 7.01 hereof. Buyer shall make available to Seller, its attorneys and accountants, at all reasonable times during normal business hours, all books and records of the ASPD Business related to such suit, claim or proceeding, and Buyer and Seller will render to each other such assistance as they may reasonably require of each other in order to insure proper and adequate defense of any such suit, claim or proceeding. Buyer will not make any settlement of any claim which might give rise to liability of Seller under the indemnity agreement contained in Section 7.01 hereof without Seller's written consent, which consent shall not be unreasonably withheld. Buyer shall have the right initially to defend against any such suit, claim or proceeding, but if Buyer shall elect not to so defend, then Seller shall be permitted to defend against such suit, claim or proceeding; provided, however, if Seller agrees that the total claim asserted under such suit, claim or proceeding, if successful, is subject to the indemnity provisions of Section 7.01 hereof, then Seller shall have the right initially to defend. If Buyer shall desire to effect a compromise or settlement of any such suit, claim or proceeding and Seller shall refuse to consent to such compromise or settlement, then Buyer shall be excused from the defense and Seller shall bear all further responsibility for the defense of any such suit, claim or proceeding.

Section 7.14. *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of California except as to any matters which are required to be governed by the laws of any other jurisdiction.