# Illinois Official Reports

## Supreme Court

---

### *Robert R. McCormick Foundation v. Arthur J. Gallagher Risk Management Services, Inc.*, 2019 IL 123936

---

| | |
|---|---|
| Caption in Supreme Court: | ROBERT R. McCORMICK FOUNDATION *et al.*, Appellants, v. ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, INC., Appellee. |
| Docket No. | 123936 |
| Filed | November 21, 2019 |
| Decision Under Review | Appeal from the Appellate Court for the Second District; heard in that court on appeal from the Circuit Court of Du Page County, the Hon. Kenneth L. Popejoy, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | John R. McCambridge, David E. Schoenfeld, Matthew C. Wolfe, and Riley C. Mendoza, of Shook, Hardy & Bacon L.L.P., of Chicago, for appellants. |
| | Richard J. Prendergast and Michael T. Layden, of Richard J. Prendergast, Ltd., and John C. Ellis, of Ellis Legal P.C., both of Chicago, for appellee. |

Justices                          JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Burke and Justices Kilbride, Garman, Karmeier, Theis, and Neville concurred in the judgment and opinion.

## OPINION

¶ 1     The issue presented is whether the common-interest exception to the attorney-client privilege as set forth in *Waste Management, Inc. v. International Surplus Lines Insurance Co.*, 144 Ill. 2d 178, 190 (1991), extends to the circumstances of this case, where there is no insured-insurer relationship between the parties and the party claiming the privilege is bringing suit based on the defendant's negligence in failing to procure appropriate insurance as a broker. We find that the common-interest exception does not extend to the facts of this case.

¶ 2                             BACKGROUND

¶ 3     Plaintiffs, the Robert R. McCormick Foundation and the Cantigny Foundation (Foundations), brought the instant suit against their former insurance broker, Arthur J. Gallagher Risk Management Services, Inc. (Gallagher), in Du Page County circuit court. The Foundations' complaint included four counts: breach of contract to procure insurance, contractual indemnity, professional negligence, and negligent misrepresentation.

¶ 4     The complaint alleged the following facts. The Foundations are among the largest charitable organizations in the United States and engage in numerous philanthropic activities. As large charitable enterprises whose livelihoods flow from extensive securities holdings, the Foundations have need of robust insurance coverage, including directors and officers (D&O) coverage. Gallagher is a for-profit insurance brokerage firm. In 2008, the Foundations hired Gallagher as their insurance broker, and thereafter, the parties entered into a series of annual compensation agreements. An agreement signed by the parties in 2009 was in effect when the key events underlying the Foundations' claims against Gallagher took place.

¶ 5     In February 2010, the parties began discussions as to whether the Foundations should renew their primary D&O insurance coverage (the Chubb policy) through (what was essentially) a single policy with Federal Insurance Company, a member of the Chubb group of insurance companies, which gave the Foundations a total of $25 million in D&O coverage for 2008-10. The Foundations repeatedly advised Gallagher during the course of these discussions that their goal was to obtain the same breadth of coverage provided by the Chubb policy, while also seeking a reduced premium if possible.

¶ 6     In June 2010, Gallagher offered the Foundations two choices—either renew the existing Chubb policy or purchase a two-year, $25 million policy from Chartis Insurance Company (the Chartis policy). Gallagher assured the Foundations that the Chartis policy provided the same coverage as the Chubb policy and that the coverage would be "apples to apples." The proposed Chartis policy, however, had the added benefit that it carried a premium that was $3400 less than the Chubb policy. Given the difference in premiums, Gallagher recommended that the Foundations bind coverage with Chartis.

¶ 7        Unbeknownst to the Foundations, the Chartis policy actually contained a broad exclusion of claims that in any way related to the purchase or sale of securities. By contrast, the expiring Chubb policy contained a narrower securities exclusion that barred coverage only with respect to claims involving alleged violations of securities laws.

¶ 8        In 2007, the Foundations were the second largest shareholder group in the Tribune Company (the Tribune), a large multimedia corporation. At that time, the Foundations sold their preferred stock in the Tribune for some $2 billion during a leveraged buyout (LBO) of the company. About a year after that transaction, the Tribune filed for bankruptcy protection.

¶ 9        After the Tribune exited bankruptcy in 2011, aggrieved shareholders filed a number of federal suits across the country against more than 5000 defendants; the suits were eventually consolidated in the Southern District of New York. See *In re Tribune Co. Fraudulent Conveyance Litigation*, 831 F. Supp. 2d 1371 (J.P.M.L. 2011). The Foundations were named as defendants in three of the suits. These suits generally allege that the Foundations—through their directors and officers and acting in concert with other controlling shareholders— orchestrated the LBO through actual and constructive fraud. Accordingly, the suits seek to unwind the LBO and to claw back creditors' funds.

¶ 10       The Foundations tendered the suits (the LBO Litigation) to their new insurer Chartis under their D&O policy, but Chartis denied coverage under the policy exclusion for claims "in any way relating to any purchase of securities." The Foundations allege that this exclusion was not found in their prior policy with Chubb. As a result, the Foundations have been forced to fund the extremely costly defense of the sprawling and complex LBO Litigation. That defense has been largely successful to date, but it has been expensive, and the litigation will likely continue for years.

¶ 11       The Foundations assert that Chubb would have defended and indemnified them under their former policy. On that basis, the Foundations sued Gallagher for breach of contract and professional negligence resulting in loss of coverage.

¶ 12       On Gallagher's motion for summary judgment, the circuit court determined that an exclusion in the Chubb policy, too, would have barred coverage for the LBO Litigation. On appeal (the first of two appeals in this case), the appellate court disagreed with the circuit court's ruling, holding instead that the Chubb exclusion in question did not necessarily bar coverage. See 2016 IL App (2d) 150303, ¶¶ 14-16. The appellate court therefore reversed the circuit court's grant of summary judgment for Gallagher. *Id.* ¶ 17.

¶ 13       On remand, Gallagher raised several affirmative defenses, and the parties proceeded to discovery. Gallagher's affirmative defenses asserted that the Foundations' conduct in the LBO transaction was fraudulent and therefore uninsurable. Moreover, Gallagher alleged, the Foundations knew of "an ongoing, progressive loss" before they changed insurers in June 2010 and therefore would never have been entitled to coverage under an insurance policy purchased in June 2010 regardless of its terms. Gallagher stated to the circuit court that, in order to prove its defenses, it hoped to garner facts relating to the following: (1) the extent to which the Foundations advocated for the LBO, (2) the Foundations' knowledge that the sustainable debt burden that the LBO structure placed on the Tribune would result in bankruptcy, and/or (3) the Foundations' knowledge that they would be sued as a result of their involvement with the LBO. These contentions echo key allegations made in the LBO Litigation against the Foundations.

- 3 -

¶ 14        During discovery, Gallagher subpoenaed the Foundations and their legal counsel, seeking any and all communications between the Foundations and their attorneys related to the Tribune bankruptcy and the LBO Litigation. Gallagher argued that it needed these documents to prove its affirmative defenses. The Foundations refused to tender the documents, citing attorney-client privilege. The Foundations asked the circuit court to quash the subpoenas or, in the alternative, to stay the case until the completion of the LBO Litigation. When the Foundations maintained that the documents Gallagher sought included attorney-client privileged communications and attorney work product, Gallagher argued that it was entitled to the documents under the common-interest exception announced in *Waste Management*, 144 Ill. 2d 178.

¶ 15        The circuit court agreed with Gallagher, finding that Gallagher had a "common interest" with the Foundations because it was "standing in the insurer's shoes for the purposes of this malpractice issue and may bear the ultimate burden of payment of the underlying claims and defense costs, so [Gallagher's] interests have become aligned with [the Foundations' interests] in defeating or settling the underlying litigation." The circuit court also denied the Foundations' request for a stay. To preserve their appeal rights, the Foundations refused to turn over the privileged documents, and the circuit court then issued a "friendly" contempt order to allow appeal of the issue.

¶ 16        On appeal, the appellate court found *Waste Management* controlling as to allowing discovery of the documents and therefore affirmed the circuit court's discovery order in all material respects, although it vacated the contempt order. See 2018 IL App (2d) 170939, ¶¶ 15, 23. It also affirmed the denial of a stay but remanded with directions for the circuit court to proceed with discovery while monitoring the necessity for a stay in the future. *Id.* ¶ 23.

¶ 17        We allowed the Foundations' petition for leave to appeal, which asks this court to determine whether the holding of *Waste Management* applies to render the attorney-client privilege in this professional negligence case inapplicable with respect to the attorney communications mentioned in Gallagher's subpoena. Ill. S. Ct. R. 315 (eff. July 1, 2018).

¶ 18                                    ANALYSIS

¶ 19        Where legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communication relating to that purpose, made in confidence by the client, is protected from disclosure by the client or lawyer, unless the protection is waived. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 584 (2000); *People v. Adam*, 51 Ill. 2d 46, 48 (1972); 8 John H. Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961). The attorney-client privilege is an evidentiary privilege, providing " 'limited protection to communications from the client by prohibiting their unauthorized disclosure in judicial proceedings.' " *In re Marriage of Decker*, 153 Ill. 2d 298, 312 (1992) (quoting Annotated Model Rules of Prof'l Conduct R. 1.6, at 90 (2d ed. 1992)). The privilege is among the oldest privileges for confidential communications known to the common law and is essential to the proper operation of our adversarial system of justice. *United States v. Zolin*, 491 U.S. 554, 562 (1989); *Decker*, 153 Ill. 2d at 312-13. The privilege is based upon the confidential nature of the communications between the lawyer and client. *People v. Simms*, 192 Ill. 2d 348, 381 (2000). And the purpose is " 'to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information.' " *Waste Management*, 144 Ill.

2d at 190 (quoting *Consolidation Coal Co. v. Bucyrus-Erie Co.*, 89 Ill. 2d 103, 117-18 (1982)). Furthermore, the attorney-client privilege recognizes " 'that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client.' " *Fischel & Kahn*, 189 Ill. 2d at 585 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

¶ 20 But Illinois also has a general public policy of strongly encouraging disclosure of information, with a view to ascertaining the truth, which is essential to the proper disposition of a lawsuit. *Waste Management*, 144 Ill. 2d at 190. Thus, the attorney-client privilege is to be strictly confined within its narrowest bounds, limited solely to those communications that the claimant either expressly made confidential or that he could reasonably believe under the circumstances would be understood by the attorney as such. *Id.*

¶ 21 The Foundations argue before this court that the lower courts erred in applying *Waste Management* to the facts of this case to negate the privilege.

¶ 22 In *Waste Management*, both the insureds and insurers filed declaratory judgment actions seeking a determination of their respective rights and liabilities under the applicable insurance policies relative to the insurers' right to defend and duty to indemnify the insureds in personal injury and property damage lawsuits stemming from the insureds' operation of hazardous waste disposal sites. *Id.* at 186-87. The insurers denied coverage for the tort suits and, in the declaratory judgment action, sought production in discovery of the files of the insureds' defense counsel that dealt with the underlying tort litigation. The insureds claimed attorney-client and work-product privileges. *Id.* at 187.

¶ 23 This court held that all the files pertaining to the underlying litigation were discoverable and the privileges were not applicable. *Id.* at 200-01. In ruling in favor of the insurers and holding that the attorney-client privilege had no application, this court found that two of the arguments that the insurers had made were "equally significant" and controlling. *Id.* at 191, 195. With respect to the first, the court agreed with the insurers' argument that the cooperation clause in the parties' agreement, which required the parties to cooperate and imposed a duty on the insureds to assist in the conduct of litigation, negated the attorney-client privilege. *Id.* at 192. The court found that, in light of the language in the policy, "it cannot seriously be contended that insureds would not be required to disclose contents of any communications they had with defense counsel representing them on a claim for which insurers had the ultimate duty to satisfy." *Id.* This court further found that the fact that "the parties are now adverse concerning the interpretation of such terms does not negate the insureds' contractual duty" and "[a] fair reading of the terms of the contract renders any expectation of attorney-client privilege, under these circumstances, unreasonable." *Id.* at 192-93.

¶ 24 *Waste Management* next turned to consider the insurers' second argument for their entitlement to the litigation files. In that regard, the insurers argued that, under the common-interest doctrine, "the attorney-client privilege is unavailable to *insureds*." (Emphasis added.) *Id.* at 193. This court found this second argument "equally compelling" and began its analysis by noting that "no Illinois cases *** presented like facts." *Id.* But this court then found that there was a wealth of foreign authority to support the insured's position, citing seven cases that all involved an insurer-insured relationship. See *id.* (citing *International Insurance Co. v. Peabody International Corp.*, No. 87 C 464, 1988 WL 58611 (N.D. Ill. 1988), *Truck Insurance Exchange v. St. Paul Fire & Marine Insurance Co.*, 66 F.R.D. 129 (E.D. Pa. 1975),

*Southeastern Pennsylvania Transportation Authority v. Transit Casualty Co.*, 55 F.R.D. 553 (E.D. Pa. 1972), *Shapiro v. Allstate Insurance Co.*, 44 F.R.D. 429 (E.D. Pa. 1968), *Mitchum v. Hudgens*, 533 So. 2d 194 (Ala. 1988), *Goldberg v. American Home Insurance Co.*, 439 N.Y.S.2d 2 (App. Div. 1981), and *Liberty Mutual Insurance Co. v. Engels*, 244 N.Y.S.2d 983 (Sup. Ct. 1963)). This court found the foreign authority to be persuasive. *Waste Management*, 144 Ill. 2d at 193.

¶ 25 With the help of various evidence treatises, *Waste Management* then stated the common-interest doctrine as follows: "when an attorney acts for two different parties who each have a common interest, communications by either party to the attorney are not necessarily privileged in the subsequent controversy between the two parties." *Id.* (citing Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 505.7, at 277 (5th ed. 1990), Edward W. Cleary, McCormick on Evidence § 91, at 219 (3d ed. 1984), and 8 John H. Wigmore, Evidence § 2312, at 603 (McNaughton rev. ed. 1961)).

¶ 26 *Waste Management* noted that, in the typical case where the common-interest doctrine is applied, the attorney has provided joint or simultaneous representation to both parties. *Waste Management* stated, however, that it "believe[d] that the doctrine may properly be applied where the attorney, though neither retained by nor in direct communication with the insurer, acts for the mutual benefit of both the insured and insurer. [Citations.] It is the commonality of interests which creates the exception, not the conduct of the litigation." *Id.* at 194.

¶ 27 *Waste Management* then concluded its analysis with the following:

"On these facts, a less flexible application of the doctrine effectively defeats the purpose and intent of the parties' agreement. Insureds and insurers share a *special relationship*; they are in privity of contract. In a limited sense, counsel for insureds did represent both insureds and insurers in both of the underlying litigations since insurers were ultimately liable for payment if the plaintiff in the underlying action received either a favorable verdict or settlement. *To deny discovery in this instance would be to disregard considerations of public policy which require encouragement of full disclosure by an insured to his insurer*." (Emphases added.) *Id.* at 194-95.

¶ 28 The Foundations argue that *Waste Management* does not apply here because there was no "special relationship" that existed between Gallagher and the Foundations. The agreement of the parties in this case only required Gallagher to indemnify the Foundations for Gallagher's own negligence. This is therefore not like the situation in *Waste Management* where the parties had an obligation by contract and by public policy to act in good faith toward each other and to share and communicate. In this case, there was no cooperation clause, and the relationship of the parties was such that they never had a need for cooperation—Gallagher agreed to indemnify for its *own* negligence, not for the Foundations' negligence, and it never had any duty or right to defend the Foundations like an insurance company would. The appellate court in this case confused the common-interest exception with the joint-defense and nonwaiver doctrines, and it thus expanded *Waste Management*. Also, unlike the insurer in *Waste Management*, Gallagher never had a nonadversarial interest in the Foundations' defense. To establish Gallagher's negligence, the Foundations had to sue Gallagher.

¶ 29 In response, Gallagher argues that the Foundations' effort to "superimpose a 'special relationship' requirement" on the common-interest doctrine is contrary to the explicit test set forth in *Waste Management*. Gallagher contends that the Foundations' argument is, at its core,

an effort to require a contractual duty to cooperate in order for the common-interest doctrine to apply, even though *Waste Management* specifically stated that the common-interest issue was "equally significant" and "equally compelling" and found either argument "dispositive." Gallagher argues that it is the "commonality of interests which creates the exception, not the conduct of the litigation," and that here that commonality exists because, by the Foundations' own admission, Gallagher stepped into the shoes of the insurer as a *de facto* insurer. And, according to Gallagher, none of the treatises cited by the court in *Waste Management* predicated the applicability of the common-interest doctrine on the special relationship of insured and insurer.

¶ 30    Although good arguments have been presented on both sides and it is certainly true, as Gallagher maintains, that no Illinois court so far has explicitly limited the common-interest doctrine to the insurer-insured relationship (see *Selby v. O'Dea*, 2017 IL App (1st) 151572, ¶ 25 ("while Illinois courts have never explicitly limited this doctrine to the insurer-insured relationship, that is the situation where it is most obviously applicable")), we nonetheless find the Foundations' argument to be more persuasive than Gallagher's. Gallagher's argument misses the fact that the treatises relied upon in *Waste Management* discuss the common-interest doctrine in terms of two or more clients who retain or consult the same lawyer. As a matter of first impression in Illinois, *Waste Management* expanded this doctrine to the situation involving two parties who do not consult the same lawyer but who are in a "special relationship" so that they could be treated as if they did retain the same counsel. The treatises cited in *Waste Management*, including the updated versions of those treatises to reflect the current state of the law, do not indicate that the common-interest doctrine is as broad as Gallagher makes it out to be. See, *e.g.*, Edward J. Imwinkelried, The New Wigmore: A Treatise on Evidence: Evidentiary Privileges § 6.13.2 (2019) (discussing the nature of the joint-client and fiduciary exceptions to the attorney-client privilege); 1 Kenneth S. Broun *et al.*, McCormick on Evidence § 91.1 (7th ed. 2013) (in the step beyond the joint consultation situation involving an insured-versus-insurer suit, it seems undisputed that "there is no privilege where the controversy is between the insured *** and the [insurance] company itself over the company's liability under the policy"); Michael H. Graham, Graham's Handbook of Illinois Evidence § 505.7(4), at 452 (2019 ed.) (noting common-interest exception to the privilege in the typical dual representation situation and also its expansion by *Waste Management* to insured-insurer suits "even though the insurer is not a party to the initial [underlying] proceeding" that brings the policy potentially into play).

¶ 31    Moreover, no Illinois case has expanded the common-interest exception beyond the context of the insurer-insured relationship. Gallagher suggests that *BorgWarner, Inc. v. Kuhlman Electric Corp.*, 2014 IL App (1st) 131824, extended *Waste Management* in a way that is helpful to its position. But we do not find that to be the case.

¶ 32    In *BorgWarner*, the court decided the case solely on the grounds of the cooperation clause in the parties' contract, which required that the parties cooperate with respect to any underlying litigation because of third-party suits. *Id.* ¶ 33. In that case, BorgWarner sold a manufacturing site to Kuhlman. As part of the deal, BorgWarner agreed to indemnify Kuhlman against liabilities arising out of any third-party environmental claims relating to the property, on the condition that Kuhlman cooperate in connection with the defense of those matters. *Id.* ¶ 4. BorgWarner thus undertook obligations to defend and indemnify third-party claims and placed a cooperation clause in the parties' agreement akin to that found in an insurer-insured

agreement. On those facts, the appellate court held that "the plain language of the 1999 merger agreement's cooperation clause created obligations" "[s]imilar to the 'cooperation clause' in the *Waste Management, Inc.* insurance policies \*\*\*. Thus, we find that any expectation of attorney-client privilege was unreasonable." *Id.* ¶ 26. The appellate court in *BorgWarner* specifically stated that it was not addressing the common-interest doctrine. *Id.* ¶ 34. To the extent that *BorgWarner* can be read to expand *Waste Management*, its reasoning has no application here where the compensation agreement between Gallagher and the Foundations did not include any duty to indemnify the Foundations against third-party claims or any duty to cooperate.

¶ 33    We also note that many Illinois decisions as well as courts in other jurisdictions have generally refused to expand *Waste Management*. See *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2017 IL App (1st) 151465, ¶ 33; *Hartz Construction Co. v. Village of Western Springs*, 2012 IL App (1st) 103108, ¶ 30; *Illinois Emcasco Insurance Co. v. Nationwide Mutual Insurance Co.*, 393 Ill. App. 3d 782, 790 (2009); *Netherlands Insurance Co. v. National Casualty*, 283 F.R.D. 412, 418 (C.D. Ill. 2012); *Kmart Corp. v. Footstar, Inc.*, No. 09 C 3607, 2010 WL 5101406, at \*1 (N.D. Ill. Dec. 8, 2010)). And some courts have "assailed the decision as unsound and improperly reasoned." See *Allianz Insurance Co. v. Guidant Corp.*, 373 Ill. App. 3d 652, 664 (2007) (collecting cases from other jurisdictions criticizing *Waste Management*). But *cf. Abbott Laboratories v. Alpha Therapeutic Corp.*, 200 F.R.D. 401, 407-08 (N.D. Ill. 2001) (decision to deny privilege turned primarily on cooperation clause in the parties' agreement that concerned indemnification for third-party claims but also relied upon the common-interest doctrine).[1]

¶ 34    We further note that every one of the cases that *Waste Management* found persuasive in finding that the attorney-client privilege is unavailable to insureds specifically involved an insured-insurer relationship. In fact, the first case cited by this court in *Waste Management* as being persuasive—*Peabody International Corp.*—had the benefit of assessing all of the earlier decided cases before setting forth the analytical framework for holding that the attorney-client privilege is unavailable to insureds in the type of case before it (which involved similar facts to those at issue in *Waste Management*). In *Peabody*, the federal district court observed the following:

> "[T]wo doctrines are at work here: (1) the joint-client exception to the attorney-client privilege and (2) the doctrine that privity under a fiduciary contract can allow a party access to the fiduciary's attorney-client communications. The joint-client theory is typically presented when two clients of the same lawyer become adversaries. \*\*\* The privity-fiduciary theory stems from the position of trust that one party holds for another, such as corporate directors for the corporation and its shareholders, or an insurer for its policyholder. In the fiduciary relation, the fiduciary has the power to take advantage of the other party. \*\*\* Courts will in effect impose the party to whom the fiduciary duty is owed on the fiduciary's lawyer (make him a joint-client) in order to protect that party

---

[1]*Abbott Laboratories* is factually inapposite from the present case, though, for the same reasons as *BorgWarner*: (1) it involves an express cooperation clause, and (2) it concerns indemnification against third-party claims, not damages or indemnification for losses suffered on account of the negligence of the very party seeking to negate the privilege.

from disadvantage although the fiduciary's lawyer never formally represented him." 1988 WL 58611, at *3.

¶ 35    We note generally that the fiduciary-duty exception to the attorney-client privilege is a concept that arose from trust law, and it has not been recognized in Illinois law. See *MDA City Apartments LLC v. DLA Piper LLP (US)*, 2012 IL App (1st) 111047, ¶¶ 15-16; *Garvy v. Seyfarth Shaw LLP*, 2012 IL App (1st) 110115, ¶ 35. But the fiduciary-duty exception rejected in *MDA* and *Garvy* seems to be on some level different than the concept set forth in *Peabody*, as it is described there as the "privity-fiduciary theory." See *Peabody*, 1988 WL 58611, at *3. Nonetheless, the concept described in *Peabody* seems somewhat akin to the underpinnings of *Waste Management*—which relied upon a "special relationship," "privity of contract," and "public policy"—to tether its decision. Compare *id.*, with *Waste Management*, 144 Ill. 2d at 194-95.

¶ 36    At any rate, the best indication of the limited nature of *Waste Management*'s holding is the language employed in *Waste Management* itself. There, the court carefully constricted its ruling by noting that "*[o]n these facts*, a less flexible application of the doctrine effectively defeats the purpose and intent of the parties' *agreement*." (Emphases added.) *Waste Management*, 144 Ill. 2d at 194. The court also emphasized that the parties had a *special relationship* and were in *privity of contract*. We believe that the same key circumstances found in *Waste Management* are absent from the present case and that this reality requires a different result here.

¶ 37    Gallagher argues that it too is in privity of contract with the Foundations. We find, however, that the privity of contract here is fundamentally different than that which was at stake in *Waste Management* and is not helpful to Gallagher's position in any crucial way. The insured-insurer relationship in *Waste Management* brought into play public policy considerations (which are absent here) that required full disclosure by an insured to his insurer. Here, the contract between the Foundations and Gallagher simply required Gallagher to indemnify the Foundations for Gallagher's own negligence, a duty the law would arguably impose upon any tortfeasor for its own negligence regardless of contractual obligations. This is much different, we believe, than the situation in cases like *Waste Management* where the insurer has a duty to indemnify its insured for *the insured's* negligence, not the insurance company's own negligence.

¶ 38    To apply the doctrine here would be at odds with the purpose of the attorney-client privilege to promote full and frank consultation between a client and legal advisor without fear of compelled disclosure. It seems to us that Gallagher's and the Foundations' interests were always adverse, and there was not a commonality of interest in the same way that is the case when an insurer has a duty to indemnify and defend from the beginning. Here Gallagher had no such duty or right to defend and had no duty to indemnify for any negligence on the part of the Foundations; in fact, Gallagher disclaims all such duties and is being sued for its own malpractice, which arguably could be established quite apart from any duty to indemnify undertaken contractually by Gallagher. Under the circumstances, the Foundations never had any reason whatsoever to think that their attorneys would share any confidences with Gallagher. Moreover, unlike in *Waste Management*, we cannot see how the communication by the Foundations with their defense counsel is of a kind reasonably calculated to protect or further any kind of common interest between the parties in this case in defeating or settling the

claims against the Foundations in the underlying LBO Litigation.

¶ 39                                    CONCLUSION

¶ 40        For the foregoing reasons, we affirm the portions of the appellate court's judgment that affirmed as modified the denial of the stay and vacated the circuit court's contempt ruling. However, we reverse the portion of the appellate court's judgment that affirmed the circuit court's order to compel discovery. We remand the cause to the circuit court of Du Page County for further proceedings consistent with this opinion.

¶ 41        Appellate court judgment affirmed in part and reversed in part.

¶ 42        Circuit court judgment affirmed in part and reversed in part.

¶ 43        Cause remanded.