# Illinois Official Reports

## Appellate Court

---

*John Doe Corp. 1 v. Huizenga Managers Fund, LLC*, 2021 IL App (2d) 200513

---

| | |
|---|---|
| Appellate Court Caption | JOHN DOE CORPORATION 1, a/k/a Ritchie Risk-Linked Strategies (Bermuda), Ltd., and JOHN DOE CORPORATION 2, a/k/a Ritchie Risk-Linked Strategies Trading, Ltd., Plaintiffs-Appellants, v. HUIZENGA MANAGERS FUND, LLC, and HUIZENGA CAPITAL MANAGEMENT, LLC, Defendants-Appellees (Sean G. Wieber, Contemnor-Appellant). |
| District & No. | Second District<br>No. 2-20-0513 |
| Filed | August 16, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 18-CH-0236; the Hon. Bonnie M. Wheaton, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part.<br>Cause remanded. |
| Counsel on Appeal | Dan K. Webb, Sean G. Wieber, and Kevin P. Simpson, of Winston & Strawn LLP, of Chicago, and Patrick J. Williams, of Ekl, Williams & Provenzale LLC, of Lisle, for appellants.<br><br>Christopher J. Barber, Gary W. Garner, and Jonathan D. Miller, of Williams Montgomery & John Ltd., of Chicago, for appellees. |

PRESIDING JUSTICE BRIDGES delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

## OPINION

¶ 1 Plaintiffs, John Doe Corporation 1 (John Doe 1), also known as Ritchie Risk-Linked Strategies (Bermuda), Ltd., and John Doe Corporation 2 (John Doe 2), also known as Ritchie Risk-Linked Strategies Trading, Ltd., along with their counsel, Sean G. Wieber (collectively, appellants), appeal from the trial court's contempt order fining Wieber $1000 per day for refusing to produce certain documents in discovery that appellants maintain are protected by attorney-client privilege. They argue that the trial court erred in ruling that (1) plaintiffs could not assert the privilege, because they were dissolved as corporate entities during the pendency of the proceedings and (2) the crime-fraud exception to the privilege applied. They alternatively argue that, even if we conclude that the documents are not privileged, we should vacate the contempt order and its associated fine because Wieber requested the contempt order in good faith for the purpose of facilitating this appeal.

¶ 2 Whether the attorney-client privilege survives a corporation's dissolution is an issue that Illinois courts have not previously addressed. Under the specific facts of this case, we conclude that plaintiffs could not assert the privilege, because they are dissolved entities without a representative who could properly invoke the privilege on their behalf. However, we agree with appellants that Wieber requested a "friendly" contempt finding in good faith for, in significant part, an appeal of this issue of first impression. Therefore, we affirm in part, vacate in part, and remand the cause.

¶ 3                          I. BACKGROUND
¶ 4                     A. Madison County Proceedings
¶ 5 On January 31, 2018, plaintiffs, represented by B. Jay Dowling and John E. Sabo of the law firm Clayborne, Sabo & Wagner, LLP (CSW), filed in the circuit court of Madison County a civil complaint and an application to proceed under a fictitious name. The complaint named defendants, Huizenga Capital Management, LLC (Huizenga Capital), and Huizenga Managers Fund, LLC (Huizenga Fund).

¶ 6 In the application, plaintiffs alleged that John Doe 1 was a limited liability company that was organized under the laws of the Cayman Islands and operated an investment fund through its principal place of business in the Cayman Islands. They alleged that John Doe 2 was a limited liability company that was organized under Delaware law and operated an investment fund through its principal place of business in the Cayman Islands. Plaintiffs alleged that they were subject to the provisions of a confidentiality agreement that prohibited them from identifying themselves and certain other parties by their real names.

¶ 7        In their complaint against defendants, plaintiffs sought temporary restraining orders (TROs) and preliminary and permanent injunctions.[1] They alleged that they were members and/or managers of an investment fund for insurance-related investments (Investment Fund) and that Huizenga Capital provided investment management services to pooled investment funds, including Huizenga Fund. Plaintiffs alleged that defendants did business in Illinois and in Madison County. They alleged that defendants entered into two agreements in 2005 (Subscription Agreements) to purchase equity interests in the Investment Fund but that defendants then violated nondisparagement and confidentiality provisions in the Subscription Agreements. Plaintiffs alleged that they were submitting under seal an affidavit by Michael Cilento in support of their request for a TRO, through which plaintiffs sought to prohibit defendants from disparaging plaintiffs or revealing any confidential information about them.

¶ 8        The Madison County trial court granted the application to proceed under a fictitious name the same day. It also issued an *ex parte* TRO against defendants, granting the relief plaintiffs sought. This included requiring defendants to seal any court pleadings containing disparaging statements. The TRO was set to expire on February 8, 2018, and the trial court set a hearing on plaintiffs' request for a preliminary injunction for February 9, 2018. The trial court's order stated that it had reviewed and considered Cilento's affidavit, among other things.

¶ 9        The order referenced two exhibits submitted by plaintiffs during the hearing that would be filed under seal, but Dowling later stated that reference to the two exhibits was a "clerical/typographical error" that should have been deleted prior to the order's entry. It was also subsequently revealed that Cilento's affidavit had a caption for St. Clair County instead of Madison County and that it alleged that defendants conducted business in St. Clair County, with no mention of Madison County. Further, the affidavit stated that John Doe 1 was "a limited liability company organized under the laws of the Cayman Islands, [which] operates as an investment fund through its principal place of business in the Cayman Islands," and that John Doe 2 was "a limited liability company organized under the laws of the State of Delaware, [which] operates as an investment fund through its principal place of business in the Cayman Islands." Cilento's affidavit stated that plaintiffs and defendants had submitted the same Subscription Agreement for equity interests in Ritchie Risk-Linked Strategies, LLC (RRLS),[2] and that defendants' actions had resulted in plaintiffs' equity interests being damaged.

¶ 10       On February 2, 2018, defendants filed an emergency motion to transfer venue to Cook County, where they alleged that related actions had been pending for over a decade. They asserted that the alleged disparaging statements described in plaintiffs' complaint were all made in pleadings filed in those pending actions and that the TRO prohibited defendants' counsel from effectively representing them in those cases. Defendants' counsel also noted that the Cilento affidavit he received had a caption for St. Clair County and that it stated that defendants did business in St. Clair County. Dowling stated at the hearing that it was a "drafting error" and that the "materials that were sent [to defendants] were different" from the materials

---

[1]Sabo signed the complaint and the application to proceed under a fictitious name, but both Sabo and Dowling entered appearances for plaintiffs.

[2]The name "Ritchie" comes from an individual named A.R. Thane Ritchie and is used in connection with various private investment funds and related entities, including the named plaintiffs. Defendants and several Ritchie entities have been involved in lawsuits in Illinois and other jurisdictions for many years.

under seal. The trial court granted the motion to transfer on February 6, 2018, but ordered that, at plaintiffs' request, the case be transferred to Du Page County, where both defendants' principal places of business were located.

¶ 11 On February 7, 2018, the day before the TRO was set to expire, defendants filed in Madison County a motion to dissolve the TRO and for damages. They stated that the matter was still pending transfer and that they wanted to preserve their right to relief, including damages. The case was transferred to Du Page County on February 21, 2018.

¶ 12 B. Proceedings in Du Page County Begin

¶ 13 On March 5, 2018, defendants filed a motion to dismiss plaintiffs' complaint with prejudice. On May 3, 2018, plaintiffs were given leave to file their first amended complaint, with defendants' motion to dismiss deemed to apply to that complaint. The amended complaint alleged that plaintiffs were third-party beneficiaries of the Subscription Agreement. It also referenced Cilento's affidavit.

¶ 14 On May 22, 2018, the law firm of Ice Miller, LLP, entered an additional appearance for plaintiffs.

¶ 15 On June 18, 2018, plaintiffs filed a motion to stay the proceedings until the Cook County proceedings and any appeals therefrom were resolved, arguing that otherwise there could be inconsistent judgments in the different forums.

¶ 16 At a hearing on June 19, 2018, the trial court stated that it would not stay the case indefinitely, so either plaintiffs could take a voluntary dismissal of the case or it would proceed with defendants' motion to dismiss. Plaintiffs elected to voluntarily dismiss their action, over defendants' objections.

¶ 17 C. Defendants Seek Sanctions

¶ 18 On July 19, 2018, defendants filed a motion for sanctions under Illinois Supreme Court Rule 137 (eff. Jan. 1, 2018). They argued, *inter alia*, that it appeared that Dowling first sought an *ex parte* TRO in St. Clair County but was rebuffed because defendants' statements in pleadings were protected by Illinois's absolute litigation privilege. Defendants noted that Cilento's affidavit had a St. Clair County caption and stated that defendants transacted business in that county. Defendants argued that Dowling then went to Madison County and obtained the *ex parte* TRO in that forum without telling the court there that the "disparaging" statements were in court pleadings. Defendants argued separately that there was no basis to grant the TRO without notice.

¶ 19 In response, plaintiffs argued that Dowling had explained in Madison County that the references to St. Clair County were simply "drafting errors" and that, if Dowling had sought a TRO in St. Clair County, "there should be a record of it," but defendants had failed to present one.

¶ 20 A hearing on defendants' motions to dissolve the TRO and for sanctions took place on September 26, 2018. The trial court stated that plaintiffs did not argue in Madison County that notifying defendants of the proceedings would cause the very harm sought to be avoided, as required for an *ex parte* TRO, nor was that trial court apprised that the alleged disparaging and confidential statements were made in litigation. The trial court stated:

- 4 -

"And I believe that some sanctions are appropriate, not only for the failure of the plaintiffs in this case to give notice and the right to be heard, but also for the failure to apprise Judge Dugan ([in Madison County)] of very important and extremely material facts that would have allowed him to make a full and fair determination on the merits, rather than on what was presented to him.

The question then becomes what should be the scope of those sanctions. And I think that is a subject for an evidentiary hearing. The first question that comes to the Court's mind is against whom should the sanctions be levied.

We have two plaintiffs—John Doe Corporation 1 and John Doe Corporation 2. I don't even know the real name of the corporations. I don't know anything about them. I don't know that anybody else does, except for the plaintiffs' counsel. But I think that should certainly be the subject of discovery.

There should also be an *** evidentiary hearing regarding the reasonableness and necessity of any attorney's fees and, in addition, what sum is appropriate to discourage this type of conduct, either on the part of the plaintiff corporations or on the part of counsel or both.

So, I will allow you to make some reasonable inquiry and discovery as to those factors."

The trial court purported to vacate and dissolve the TRO. It entered and continued defendants' request for sanctions and damages, pending discovery and an evidentiary hearing "to determine the scope, against whom, the amount, and nature of sanctions and/or damages."

¶ 21    Plaintiffs filed an interlocutory appeal of this ruling, and we dismissed the appeal for lack of jurisdiction on December 21, 2018. *John Doe Corp. 1 v. Huizenga Managers Fund, LLC*, 2018 IL App (2d) 180796-U. We stated that the trial court could not have dissolved the TRO, because it had already expired by its own terms by that time, depriving us of jurisdiction to examine the appeal's merits. *Id.* ¶¶ 16-17.

¶ 22    On November 6, 2018, Ice Miller filed a motion to withdraw. Winston & Strawn entered its appearance as additional counsel for plaintiffs on November 14, 2018; Wieber, from Winston & Strawn, served as plaintiffs' primary counsel from this point forward.

¶ 23    In discovery responses filed in February 2019, plaintiffs asserted various objections, including that certain information was protected by the attorney-client privilege.

¶ 24    On February 19, 2019, plaintiffs filed a combined notice of tender of judgment, motion to dismiss the remaining proceedings, and motion to stay discovery pending a ruling on the motion to dismiss. They argued that on May 7, 2018, defendants submitted a declaration seeking $32,704.66 in attorney fees and costs, which fees had purportedly increased to $252,160.12 by January 11, 2019. Plaintiffs asserted that the case had no remaining purpose other than defendants' generation of attorney fees and that plaintiffs had tendered to defendant the entire $252,160.12 to avoid the fruitless exercise of continuing. They argued that, "[w]ithout admitting to any of Defendants' allegations, Plaintiffs have mooted Defendants' claims for damages and sanctions by tendering the full amount of relief that Defendants seek."

¶ 25    Defendants filed a response in opposition on February 28, 2019, stating that they had incurred additional fees and costs since the last affidavit, that Rule 137 did not limit sanctions to just attorney fees and costs, that nonmonetary sanctions in the form of restrictions on future litigation would be justified, and that the tender was invalid because it was conditioned on

plaintiffs' ability to deny all of defendants' factual allegations underlying its claim for sanctions.

¶ 26    At a hearing on April 19, 2019, Wieber identified plaintiffs on the record. He stated that John Doe 1 was Ritchie Risk-Linked Strategies (Bermuda), Ltd., and that John Doe 2 was Ritchie Risk-Linked Strategies Trading, Ltd.[3] That day, the trial court denied plaintiffs' motion to dismiss and stay discovery. On April 29, 2019, Dowling and CSW filed a motion to withdraw as counsel. In their motion, they repeatedly referred to John Doe 1 as "a Cayman Island Corporation" and John Doe 2 as "a Delaware Corporation." These identities are consistent with the identities represented in Madison County and inconsistent with the identities revealed to the Du Page County trial court on April 19. The trial court granted CSW's motion to withdraw on May 15, 2019, with the conditions that it was retaining jurisdiction over CSW, Dowling, and Sabo and that they were to retain control over any case documents currently within their possession.

¶ 27    Also on May 15, 2019, the trial court amended the case caption to identify plaintiffs, and it vacated the Madison County trial court's January 31, 2018, sealing order, including its authorization for plaintiffs to proceed with the lawsuit under fictitious names. Thereafter, plaintiffs served interrogatory responses that identified plaintiffs as they were identified in open court, stated that both entities were organized in Bermuda, stated that plaintiffs' manager was Ritchie Capital Management SEZC, Ltd. (SEZC), and stated that plaintiffs' directors had resigned on December 28, 2018.

¶ 28    On May 21, 2019, plaintiffs served some discovery responses in which, over objection, they stated that they did not have any documents showing, as stated in Cilento's affidavit, that plaintiffs submitted a Subscription Agreement, that it was accepted, or that plaintiffs had any equity interest in RRLS.

¶ 29                    D. Defendants Argue Exceptions to the Attorney-Client Privilege

¶ 30    On July 12, 2019, defendants filed a motion to pierce the attorney-client privilege and related privileges, based upon the crime-fraud exception and the lack of privilege for defunct entities. They argued that the crime-fraud exception applied because plaintiffs had submitted conflicting sworn statements about their identities, which remained a mystery, and had made other demonstrably false statements, revealing fraud and possibly perjury. Defendants further argued that, if plaintiffs no longer had any legal existence, they could not assert privileges. Defendants also argued that certain individuals involved with the litigation had a pattern of misconduct and that their communications were not covered by the attorney-client privilege.

¶ 31    On July 17, 2019, plaintiffs filed a motion for a protective order, in which they stated that

"SEZC had authority to direct the Plaintiffs' litigation decisions, and in so doing, relied on the advice of a group of individuals that included outside counsel: John Sabo and Jay Dowling; inside advisors: Michael Cilento, Thane Ritchie, Ken Rosenblum, and Nathan Smith; with related support to outside counsel and inside advisors provided by: Paul Whinnery, Garrett Vail, and Robert Brownell."

---

[3]According to defendants, CSW had informed them of these identities over the phone in "early 2018," but plaintiffs had not confirmed or denied this information on the record until this time.

Plaintiffs made an almost identical statement in an interrogatory response they served on November 15, 2019, in response to the question of which person or persons authorized the lawsuit.

¶ 32    Plaintiffs were involuntarily dissolved as corporations on August 16, 2019, in that they were struck from the Bermuda companies registry. The same day, CSW filed a motion for a protective order. It attached as an exhibit an affidavit by Dowling, which we summarize, in relevant part. He had personal knowledge that plaintiffs were the parties currently identified as such. However, the TRO pleadings were initially drafted to be brought by different plaintiffs, but shortly before the January 31, 2018, filing:

> "[T]hose initial plaintiffs were substituted out of the TRO Pleadings, and the Doe Plaintiffs were inserted in their place. However, certain allegations in the TRO Pleadings were inadvertently not revised to reflect the new Plaintiffs. Accordingly, the TRO Pleadings do not accurately describe the Doe Plaintiffs."

Dowling stated that on January 30, 2018, he went to the St. Clair County circuit court courtroom where chancery cases were typically assigned and he saw Judge Stephen P. McGlynn there. Dowling asked if the judge would consider scheduling a hearing on an *ex parte* TRO that had not yet been filed, and Judge McGlynn inquired about the general nature of the request. Dowling began answering while Judge McGlynn was quickly flipping through the TRO pleadings, and the judge asked if the case involved Peter Huizenga. Dowling said that it did and inferred that Judge McGlynn may have a connection to Peter Huizenga, and therefore a conflict, so they concluded the conversation, which did not last more than five minutes.

¶ 33    Dowling stated that, the following day, he presented the TRO pleadings in Madison County, at which time an exhibit still bore the St. Clair County caption. In Madison County, Judge Dugan asked about the basis for an *ex parte* TRO, and Dowling said that the contracts permitted emergency injunctive relief. Judge Dugan inquired whether all of the disparaging comments were made in pleadings, and Dowling stated that defendants had made disparaging remarks in pleadings but that plaintiffs believed that defendants had also made disparaging remarks outside of pleadings. Dowling said that the request for the TRO was also based on contractual confidentiality provisions. Dowling averred that he filed the TRO pleadings not for an improper purpose but rather to enforce adherence to prelitigation contractual obligations.

¶ 34    On November 13, 2019, defendants filed a supplemental motion to compel production of allegedly privileged documents, based on the crime-fraud exception. They alleged that they had learned that plaintiffs and CSW had destroyed critical documents pursuant to sham document retention policies that were created after defendants filed their sanctions motion; that the affidavit of Cilento that was served on defendants was created through fraud and deceit, if not forgery; and that plaintiffs' "scheme" was aided by the unauthorized practice of law of two nonlawyers whose criminal backgrounds were the subject of federal case law.

¶ 35    On January 16, 2020, plaintiffs filed a response in opposition to defendants' motions to obtain privileged documents. They argued that their identities were not in question, because their counsel had reviewed relevant documents identifying plaintiffs and confirmed those identities to defendants and the court many times on and off the record and had additionally submitted multiple sworn admissions. Plaintiffs further argued that dissolved entities could assert the attorney-client privilege and that the crime-fraud exception did not apply, because defendants had not presented evidence of either a crime or a fraud. Plaintiffs stated that,

"[w]hile errors were committed in the process of obtaining the TRO, nothing about Plaintiffs' *intent* to obtain the TRO was fraudulent." (Emphasis in original.)

¶ 36    On February 19, 2020, defendants impleaded SEZC as a sanctions respondent.

¶ 37                    E. Trial Court's Initial Ruling on Attorney-Client Privilege

¶ 38    The trial court held a hearing on the privilege issue on February 20, 2020. After argument, it stated:

> "I have said many times in this case that the issues before me are one, whether sanctions are appropriate, two, against whom should sanctions be levied if they are indeed appropriate, three, what sort of sanction is necessary to compensate the Huizenga Defendants and or deter future conduct of this sort.
>
> As I sit here today I'm no closer to an answer to those questions than I was a year and a half ago. As Mr. Wieber said, to *** pierce the attorney[-]client privilege which is sacrosanct in Illinois requires exceptional circumstances. And I think this case presents exceptional circumstances. *** [I]t is clear from the abundant exhibits *** that someone attempted to or did indeed perpetrate a fraud upon the court. That started out with the filing of a petition for an ex-parte temporary restraining order without notice. *** We all know that a petition for a temporary restraining order without notice must explain to the Court why the giving of notice would engender the harm sought to be avoided by the temporary restraining order. It is abundantly clear from the exhibits that representations were made in the petition and before the judge in Madison County which were false. Those included a description of the Doe entities and allegations in the underlying complaint which were later admitted to be false. Now, attorneys have said quote mistakes were made unquote. That's an expressive in the passive voice. I need to know *** by whom were those quote mistakes unquote made? *** I believe that for the purpose of this motion only that the Defendant's [*sic*] have established that there was a fraud upon the Court, and thus the crime-fraud exception requirements have been set. The time period in question is *** December of 2017 and February of 2018. I think all communications between the attorneys and whoever was purporting to represent the interests of the Plaintiffs, whoever they were, the Doe Plaintiffs or the entities described in the petition. All of those communications are certainly relevant as to whether sanctions should be imposed, and if so against whom. I'm going to grant the motion on that basis. I don't believe I have to reach the issue of the defunct corporation ***."

The trial court denied plaintiffs' requests to have it view the documents *in camera*, and it ordered plaintiffs and CSW to produce responsive documents by March 19, 2020, for the period of December 29, 2017, to February 2, 2018. It denied without prejudice defendants' arguments that certain individuals involved in the litigation and defunct entities in general could not assert the privilege.

¶ 39                    F. Plaintiffs Move to Reconsider Privilege Ruling

¶ 40    On March 18, 2020, plaintiffs filed a motion to reconsider or, in the alternative, for friendly contempt and a stay. They asked that the trial court review the privileged communications, which amounted to only about 70 unique e-mail chains, *in camera*. They asserted that the

communications showed that any errors in the process of obtaining the TRO were inadvertent rather than malicious. Plaintiffs alternatively requested that the trial court hold them in friendly civil contempt, issue a fine of $100, and stay all proceedings pending the appeal from the contempt finding. Plaintiffs stated that CSW was deferring to their instructions on the assertion of privilege.[4]

¶ 41 Defendants filed a motion in opposition on March 31, 2020. They argued that the trial court could not find plaintiffs in contempt, because plaintiffs no longer existed. They asserted that the trial court should order plaintiffs to produce at an evidentiary hearing the person responsible for asserting the privilege. That person could choose to comply with the order to produce documents, and if the individual refused, the trial court could hold that person in contempt. Defendants additionally argued that *in camera* review was not warranted, because the crime-fraud exception applied and because plaintiffs had waived their assertion of privilege by disclosing the documents' contents.

¶ 42 On April 10, 2020, SEZC entered an appearance and moved for a substitution of judge as of right. The trial court ultimately held the motion in abeyance pending a decision on the attorney-client privilege issue.

¶ 43 G. Trial Court Grants Plaintiffs' Motion to Reconsider, in Part

¶ 44 The parties argued the motion to reconsider at a hearing on July 21, 2020, after which the trial court stated as follows:

"I do not know definitively who the plaintiffs are. Mr. Wieber says they are one set of entities, Mr. Garner [(defendants' counsel)] says they are another set of entities. And it becomes very important to the Court to know who the plaintiffs are because I cannot hold a defunct corporation in contempt. That would be a fruitless exercise.

I still don't know who is running this show. I sound like a broken record, I know, because every time you're in front of me I say we're even farther down the road, and this whack-a-mole is popping up in another place."

The trial court stated that it was vacating its prior ruling that required plaintiffs to turn over the documents in their privilege log and granting defendants' request for an evidentiary hearing "on the issue of privilege and the issue of the identity of the plaintiff and the authority of whoever the plaintiff is determined to actually be to assert the privilege."

¶ 45 Wieber argued that plaintiffs were out of operation and had no officers, directors, or employees. He stated: "Consistent with going all the way back to when the lawsuit was launched, they had already assigned their—their ability to launch that lawsuit through SEZC, which is the entity that is not asserting their own privilege, but is asserting a privilege on behalf of the Does." The trial court stated, "Well, that's the first time I'm hearing that." Wieber stated that it was not a technical assignment but that rather he was referring to management agreements between the two plaintiffs and SEZC that had been disclosed. He further argued that SEZC was a separate client with a motion to substitute judges pending in this action. The trial court replied: "I don't care who that live body is, I want a live body in the courtroom who can tell me that he or she represents the plaintiff in this case, has actual knowledge of who is

---

[4]Defendants later asked CSW to which plaintiffs it was deferring, and it stated that it was deferring to Winston & Strawn's assertions of privilege because that firm was representing plaintiffs.

asserting the privilege and by what authority." The trial court granted plaintiffs' request for an *in camera* inspection of the documents, with the relevant period expanded to December 11, 2017, through February 2, 2018.

¶ 46 The trial court's written order was entered on July 28, 2020. It stated that plaintiffs' motion to reconsider was granted in part, in that it was (1) vacating its prior ruling requiring plaintiffs to turn over the privileged documents to defendant, (2) granting plaintiffs' request for an *in camera* review of the privileged documents, and (3) entering and continuing the request for a finding of friendly contempt and a stay pending appeal. The trial court further granted defendants' request for an evidentiary hearing to the extent stated on the record.

¶ 47 At a status hearing on July 30, 2020, the trial court stated that it did not have a definitive answer as to whether the attorney-client privilege survived the demise of a corporation. It stated that it did not find Illinois law on this subject but that, under federal law, which was persuasive authority, the privilege did not survive absent a compelling reason.[5] Therefore, plaintiffs had the burden of showing a compelling reason at the evidentiary hearing. It stated that it would not review the disputed documents *in camera*.

¶ 48                                H. Evidentiary Hearing

¶ 49 The evidentiary hearing occurred on August 18, 2020. David Moes was sworn in as a witness for plaintiffs. Defendants made a standing objection based on lack of personal knowledge to testify, and the trial court took the objection under advisement. Moes testified that he was the senior managing director for Ankura Consulting Group, LLC, which was a "diversified professional services firm." He was retained on June 10, 2019, to act as a corporate representative for plaintiffs and was present at the hearing as a fact witness. After the trial court sustained various objections by defendants based on foundation and hearsay, plaintiffs provided an offer of proof, as follows.

¶ 50 On the issue of good cause, Wieber stated that Moes would have testified that plaintiffs were incorporated in 2004 and dissolved on August 16, 2019, which was during the litigation. Moes would testify that plaintiffs were actively involved in the litigation, particularly the sanctions matter, and that the litigation was their only remaining operation. Moes would testify "that the communications that sit on the privilege logs for both the CSW entity and both the Plaintiffs surround the 36-day period on or about *** December 17th, 2017 to on or about February 2 of 2018 *** [and] relate to the decision making and factual circumstances surrounding that underlying lawsuit." He would have testified that "the ability for those entities to still assert the privilege would be important for those entities as well as having import for other Ritchie-related entities that *** are mentioned in conjunction with those same communications that sit on the log."

¶ 51 On the issue of authority, Moes would have testified that there was a

> "formal channel of authority; and that is derived through *** SEZC's formal authority in the structure through the investment management agreement *** and then in an operational channel, which is, in essence, operational authority as delegated in the

---

[5]The trial court cited *Trading Technologies International, Inc. v. GL Consultants, Inc.*, No. 05-4120, 2012 WL 874322, at *4 (N.D. Ill. Mar. 14, 2012), *TAS Distributing Co. v. Cummins, Inc.*, No. 07-1141, 2009 WL 3255297, at *2 (C.D. Ill. Oct. 7, 2009), and *Lewis v. United States*, No. 02-2958 B/AN, 2004 WL 3203121, at *4 (W.D. Tenn. Dec. 7, 2004).

- 10 -

normal course to a group of inside advisors, which Mr. Moes has identified in sworn interrogatories, which are in evidence in this case."

¶ 52    On cross-examination, Moes testified that he did not speak to any of plaintiffs' directors and that he had reviewed the privilege logs but not the documents referenced in the logs. He testified that he had no personal involvement in the events that gave rise to the case but that he had conducted due diligence by reviewing documents and having discussions with individuals with knowledge.

¶ 53    The trial court found as follows:

"I have stated several times that this issue of whether the attorney/client privilege survives the demise of a corporation is a case of first impression in the State of Illinois courts. But I will remind you that there was another basis on which I ordered the production of documents from the corporation, and that was the crime[-]fraud exception.

I made a finding for the purpose of this motion that there had been a fraud perpetrated upon the court. As you will recall, on January 30th of 2018, I believe it was Mr. Sabo[6] went to a judge, an unnamed judge in St. Clair County, and in what I consider to be an extremely unusual maneuver gave certain papers to the judge without filing them. And when the judge made some reference to Peter Huizenga, Mr. Sabo took his papers and left.

The next day he went to Madison County with the same papers and obtained an *ex parte* temporary restraining order. Among those papers was an affidavit which still bore the heading of the St. Clair County court signed by the late Michael [Cilento] in which he alleged—or affirmed, rather, that John Doe Corporation 1 was a corporation organized as a limited liability company in the Cayman Islands with its principal place of business there in the Cayman Islands.

He also averred in his affidavit that John Doe Corporation 2 was a limited liability company organized under the laws of the state of Delaware with its principal place of business in the Cayman Islands.

The Court will take judicial notice that the Cayman Islands are not a part of Bermuda. Here we have two corporations identified as Bermuda corporations who purport to be the corporations, who are John Doe 1 and John Doe 2.

I found for the purpose of this motion that that was a fraud upon the court. Now, there may have been some switching back and forth of who the Plaintiff was going to be, which may ultimately lead to a finding that there was not a fraud upon the court. But I made that finding for the purpose of this motion.

The second issue was the one that I originally referred to, whether the attorney/client privilege survives the demise of the corporation. I believe that the reasoning in the cases that I cited to you at our last court appearance is persuasive. The Federal District cases are not precedential, but they are instructive; and, indeed, I believe that they are persuasive.

---

[6]Dowling's affidavit stated that he, rather than Sabo, took the pleadings to St. Clair County and then to Madison County. Both attorneys represented plaintiffs at that time.

I gave you the opportunity to have this hearing so that you could tell me, convince me, that there was some compelling reason why the attorney/client privilege should persist. With all due respect to Mr. Moes, the only information he has about these two Plaintiff corporations are from people with whom he spoke and documents which he reviewed. That makes his testimony legally incompetent. I said [that] with all due respect. However, anyone walking in off the street could listen to what somebody else told them and review any documents and make the same determination. That's not due diligence. That's hearsay.

I have not heard any reason, let alone a good reason or a compelling reason, why the attorney/client privilege of the two Bermuda corporate entities should persist after their demise. I am going to order that the documents be provided to [defendants] within 48 hours."

The trial court ordered that Wieber turn over the documents to defendants by August 20, 2020.

¶ 54                                    I. Contempt Finding

¶ 55       At a hearing on August 21, 2020, Wieber stated that he did not produce the documents, pursuant to his clients' instructions. He stated that, as a result, he expected that the trial court would enter a contempt order, which he would then appeal. Wieber stated that he was taking this action "clearly not to flaunt" the trial court's authority but rather "to undertake an appeal being made in good faith." Wieber argued that it was *per se* good faith to appeal an issue of first impression, which in this case was the question of whether a legally dissolved entity could assert the attorney-client privilege, and that he would also contest the legal issue of whether the crime-fraud exception applied. He therefore asked that the trial court hold him in "friendly" contempt. He asked that, if the trial court determined that the contempt was not in good faith, it refrain from entering a "draconian" fine. Wieber stated that he had consulted with colleagues about this issue and was trying to carry out his clients' instructions and ethical obligations.

¶ 56       The trial court stated:

"You are correct that you are playing the hand that you were dealt. Unfortunately, you were dealt the hand of now representing a defunct corporation. I cannot, given the history of this case, make a finding that this involves good faith whatsoever.

The record is replete with references to the myriad of litigation that has gone on between what I will call the Ritchie entities and the Huizenga entities, not only in Cook County, in the appellate court; in the U.S. Supreme Court; in Delaware courts; in St. Clair County, Illinois; in Madison County, Illinois; and now in Du Page County, Illinois. I can't set that aside.

Somebody is directing this litigation. Obviously, somebody has directed you to refuse to comply with the order that was entered. I cannot find that that was done in good faith. I have the utmost respect for you as a practitioner. I think you are extremely intelligent. I think you are more than competent. I think you are outstanding in your advocacy; however, you are playing the hand that was dealt.

I find that the failure and refusal to comply with a valid order of court is willful and contumacious."

The trial court stated that, if it "knew the identity of anybody who was actually running this show, we would not be in this position." It stated that, "if there were anyone else in this

litigation against whom [it] could assess a fine and a finding of contempt, [it] would do that; however, [Wieber was] the only one [it had] before [it]." It imposed a sanction of $1000 per day until the matter was resolved by the appellate court, with collection of the proceeds stayed until the mandate was issued. The contempt could be purged by production of the documents as ordered by the trial court.

¶ 57    The trial court further stated:

> "I am not assessing that fine lightly. I understand your individual position; however, given the multi-million dollars that has been at stake in the various pieces of litigation between these two parties, I think that it is appropriate.
>
> I want to get the attention of whoever is running this show. I am very serious about trying to uphold the dignity of the court."

The trial court stated that, even though it thought that Wieber was a "fine attorney," it "believe[d] that a thousand dollars a day, given all of the circumstances in this case, [was] an appropriate fine." It also stated, "Now, it may turn out that crime-fraud exception is not borne out by evidence and testimony, but at this point we can't get there without the production of the documents that I have ordered."

¶ 58    On August 31, 2020, plaintiffs filed a motion to amend the contempt order. They asserted that they disagreed with the order as drafted by defendants and entered by the trial court, including that it lacked specific findings and incorrectly stated that the trial court found Wieber in direct civil contempt of court.

¶ 59    The trial court denied the motion at a hearing on September 2, 2020. It stated that Wieber was in direct civil contempt of court because it directly asked Wieber whether he was refusing to turn over the documents, and he answered in the affirmative. The trial court stated that the contempt order, along with the report of proceedings, accurately reflected its findings. As to the amount of the sanction, the trial court expressed:

> "The amount of the sanction *** reflects the frustration that I have had for the past two and a half years that this case has been pending. We are no closer to determining if a sanction isn't [sic] warranted and, if so, against whom and in what amount than we were in February of 2018 when this case made its way up from Madison County to Du Page County."

It additionally stated:

> "I have no idea still who that client is. I've been told that it's a now defunct Bermuda corporation. I've been told that something was assigned in this litigation to some other entity, but I have not seen a shred of evidence or testimony as to what was assigned, by whom it was assigned, to whom it was assigned, and by what means. I have not seen a corporate resolution. I haven't even seen an email. I don't even know who Mr. Wieber's client really is. And as I said before, if I had anybody else, anybody, on which I could impose a sanction of contempt, Mr. Wieber would not be in this position."

¶ 60    Appellants timely appealed.

## II. ANALYSIS

### A. Motion and Objection Taken With Case

We initially address a motion by defendants and an objection by appellants that we ordered taken with the case. In appellants' reply brief, they state that defendants rely on the trial court's February 20, 2020, ruling to argue that defendants met their burden of proving that the crime-fraud exception to the attorney-client privilege applied but that defendants "fail[ ] to mention—in violation of [their] duty of candor to this Court—that the trial court later reconsidered and *vacated* its February 20, 2020 Order." (Emphasis in original.)

Defendants thereafter filed a motion for leave to file a surreply brief and to strike portions of appellants' reply brief. First, defendants argue that we should allow them leave to file a surreply brief, which they attached to their motion as an exhibit, to address appellants' statement that they violated their duty of candor to this court and show that the accusation of professional misconduct is meritless. Defendants argue that the surreply brief is also warranted to counter appellants' assertion that defendants forfeited certain arguments by failing to raise them in the trial court.

Second, defendants argue that we should strike the footnotes from appellants' reply brief because, although the brief appears to fall within the 20-page limit, it includes 12 single-spaced footnotes amounting to 60 lines of text, which is equivalent to 2 double-spaced pages of additional text.

Appellants have filed an objection to defendants' motion. They argue that their reply brief addresses only arguments raised in defendants' response brief, specifically noting that defendants omitted a key procedural fact, so nothing in their reply brief warrants a surreply. Appellants further argue that defendants' allegation that they materially misrepresented the record is factually wrong and that, even otherwise, such an allegation does not call for a surreply. Appellants argue that the substance of the surreply is also without merit. Last, appellants assert that their footnotes violate neither the letter nor the spirit of Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020).

Because appellants have implicated defendants' attorneys' integrity by stating that they have violated their "duty of candor" to this court, we grant defendants' request to file a surreply brief addressing this issue. However, we deny defendants' request to address appellants' assertion that defendants forfeited arguments, so we do not consider this portion of their surreply brief. We also deny defendants' request to strike the footnotes in appellants' reply brief, as appellants do not appear to have been using the footnotes to bypass page limitations. However, we remind appellants that "[f]ootnotes are discouraged." Ill. S. Ct. R. 341(a) (eff. Oct. 1, 2020). Further, a party may not make substantive arguments in footnotes (*Benz v. Department of Children & Family Services*, 2015 IL App (1st) 130414, ¶ 27), whereas here appellants have included numerous case citations in their footnotes. We caution appellants that future use of footnotes in this manner may result in the court striking them.

### B. Guidance on Sanctions Proceedings

Appellants first ask this court to provide guidance on the parameters of the sanctions proceedings, arguing that the proceedings are substantively and procedurally defective and that they are "forced to defend themselves indefinitely against an opponent that has no incentive to end the litigation because it believes its costs of prosecution will be fully reimbursed."

However, appellants themselves recognize that "these issues are not ripe for this appeal." Appellants have filed this appeal under Illinois Supreme Court Rule 304(b)(5) (eff. Mar. 8, 2016), which provides for the appeal of an order that finds a person or entity in contempt of court and imposes a penalty. Additionally, [w]hen an individual appeals from a contempt sanction imposed for violating, or threatening to violate, a discovery order, the contempt finding is final and appealable and presents to the reviewing court the propriety of that discovery order." *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 54 (2002). However, our jurisdiction does not extend beyond these issues, nor do courts of review render advisory opinions (*Goral v. Dart*, 2020 IL 125085, ¶ 76), so we confine our analysis to the issues properly before us.

¶ 70       C. Whether the Attorney-Client Privilege Survives a Corporation's Demise

¶ 71       We next turn to appellants' argument that the trial court erred in ruling that plaintiffs could not assert the attorney-client privilege, because they were dissolved corporations that failed to present a compelling reason why the privilege should continue to apply. The attorney-client privilege, which protects both the client's communications to the attorney and the attorney's advice to the client, is one of the oldest privileges for confidential communications in common law. *People v. Radojcic*, 2013 IL 114197, ¶¶ 39-40. The privilege's purpose is to "promote full and frank communication between the client and his or her attorney, without the fear that the confidential information will be disseminated to others," which in turn promotes sound legal advice and advocacy. *Id.* ¶ 39. In addition to individuals, corporations may assert the attorney-client privilege. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). However, "Illinois also has a general public policy of strongly encouraging disclosure of information, with a view to ascertaining the truth, which is essential to the proper disposition of a lawsuit," such that the "attorney-client privilege is to be strictly confined within its narrowest bounds." *Robert R. McCormick Foundation v. Arthur J. Gallagher Risk Management Services, Inc.*, 2019 IL 123936, ¶ 20. The party asserting the attorney-client privilege has the burden of showing that it applies. *Margules v. Beckstedt*, 2019 IL App (1st) 190012, ¶ 21. We review *de novo* the applicability of the attorney-client privilege. *Id.* ¶ 19.

¶ 72       Appellants argue that plaintiffs should be allowed to assert the attorney-client privilege because, even though plaintiffs are dissolved entities, they are currently defending against a sanctions claim. Appellants maintain that the privilege is a core tenet of the adversarial process such that no entity can meaningfully litigate without it. Appellants argue that nationwide case law confirms that an actively litigating entity is entitled to assert the attorney-client privilege, even after it dissolves. See *Official Committee of Administrative Claimants ex rel. LTV Steel Co. v. Moran*, 802 F. Supp. 2d 947, 949 (N.D. Ill. 2011) (a dissolved corporation should be allowed to assert its privilege during the windup process until all matters involving the company are resolved and there are no further proceedings contemplated); see also *PCS Nitrogen, Inc. v. Ross Development Corp.*, No. 2:09-3171-MBS, 2011 WL 3665335, at *4 (D.S.C. Aug. 19, 2011) (South Carolina law allows dissolved corporations to be sued, and they have the same rights during litigation as they did predissolution, such that "failing to recognize an attorney-client privilege would be a significant exception to the rule, and could chill corporate-attorney communications"); *Reilly v. Greenwald & Hoffman, LLP*, 127 Cal. Rptr. 3d 317, 324 (Ct. App. 2011) ("It is only logical that if a dissolved corporation continues to exist for litigation, it remains the holder of the attorney-client privilege during the litigation.").

Appellants additionally cite *Favila v. Katten Muchin Rosenman LLP*, 115 Cal. Rptr. 3d 274, 299 (Ct. App. 2010), where the court stated:

"[A] dissolved corporation continues to exist for various purposes. Because it continues in existence, not unlike the personal representative of an individual client who has died ***, it would appear the persons authorized to act on the dissolved corporation's behalf during the wind-up process—its ongoing management personnel—should be able to assert the privilege, at least until all matters involving the company have been fully resolved and no further proceedings are contemplated."

¶ 73 Appellants argue that, unlike the cases that they cite above, the cases that the trial court cited are inapplicable because they all involved entities that were not parties to the litigation and dissolved years before the privilege was asserted. Appellants contend that, in contrast, they are still defending themselves against a sanctions claim in the case, they did not dissolve until 18 months into the litigation, they asserted the privilege before they were dissolved, and the privileged communications are from the period of time applicable to the trial court's sanctions determination, which predates plaintiffs' dissolution. Appellants argue that these circumstances cannot result in the loss of the privilege, especially when they are no longer pursuing their own claims.

¶ 74 Appellants argue that permitting plaintiffs to maintain the attorney-client privilege is also consistent with Illinois public policy, as the principles behind the privilege apply regardless of whether an entity is dissolved. Appellants argue that, without the privilege, actively litigating clients like themselves could not share privileged communications with their counsel regarding ongoing litigation strategy, for fear that their opponent could access these communications and that they would lose the ability to effectively defend themselves. Appellants further point out that, under section 12.80 of the Business Corporation Act of 1983, Illinois entities can prosecute or defend against claims during a five-year, postdissolution windup period. 805 ILCS 5/12.80 (West 2018). They argue that doing so without the attorney-client privilege would be almost impossible and that, although they are not Illinois companies, the trial court's ruling would apply equally to all entities.

¶ 75 In response, defendants first argue that plaintiffs failed to prove the elements giving rise to the privilege, as the record contains no supporting evidence and plaintiffs' witness, Moes, lacked personal knowledge of the documents listed in the privilege log. Defendants argue that plaintiffs offer only their unsworn characterizations of the documents, but none of the individuals listed in the logs were officers, directors, or employees of plaintiff. See *Hyams v. Evanston Hospital*, 225 Ill. App. 3d 253, 258 (1992) (a corporate claimant must show that the statement was made to an attorney by someone in the company's "control group"). Defendants further argue that several of the lawyers listed in the logs denied ever representing any Ritchie entities in connection with this litigation. Defendants maintain that in the trial court plaintiffs vaguely attempted to raise the "common interest" exception to defend the fact that the communications were by mostly third parties but that they never presented evidence of a common interest agreement between plaintiffs and any third parties, which would be required to invoke the exception.

¶ 76 Appellants respond that defendants forfeited this argument by failing to raise it in the trial court. Our review of the record shows that, although defendants did not assert this argument as directly as the arguments addressed by the trial court, they did argue in pleadings and at hearings that certain individuals involved with plaintiffs' litigation were not covered by the

attorney-client privilege. The trial court denied this argument without prejudice. See *supra* ¶ 36. Although we may affirm the trial court's ruling on any basis found in the record (*In re Marriage of Wig*, 2020 IL App (2d) 190929, ¶ 15), accepting defendants' argument requires factual findings by the trial court that are not present here regarding the individuals and the attorneys in the privilege log.

¶ 77 Defendants next argue that plaintiffs' assertion, that they do not have to show a compelling reason for the privilege to apply because they are actively litigating the case, is factually misguided because the trial court repeatedly ruled that plaintiffs have not established their true identities and that it still did not know who was "running the show." Defendants maintain that the trial court offered plaintiffs the opportunity to prove their identities at the evidentiary hearing but that they failed to do so.

¶ 78 Appellants respond that "there has never been any doubt that Plaintiffs are the Ritchie Bermuda Entities," as plaintiffs informed defendants of their identities in early 2018, Wieber identified them on the record, and the trial court amended the caption to name them. Appellants argue that they submitted more undisputed evidence of their identities through an affidavit from former counsel and verified interrogatory responses. Appellants maintain that, if they are not the dissolved Ritchie Bermuda Entities, the factual predicate for the trial court's ruling that dissolved entities cannot assert the privilege vanishes.

¶ 79 Suffice it to say that appellants' statement that "there has *never been any doubt* that Plaintiffs are the Ritchie Bermuda Entities" (emphasis added) is a gross misstatement of the record. As the trial court noted, the description of the Doe entities in Madison County filings was admittedly false, which contributed to its initial ruling that the crime-fraud exception applied. On July 21, 2020, the trial court stated that it did "not know definitively who the plaintiffs" were and "still [did not] know who [was] running this show." It stated that it would hold an evidentiary hearing "on the issue of privilege and the issue of the identity of the plaintiff and the authority of *whoever the plaintiff is determined to actually be* to assert the privilege." (Emphasis added.) We do agree with appellants that, for the purposes of the rulings at issue in this appeal, the trial court accepted their representation of their identities. At the evidentiary hearing, it stated that it had "not heard any reason, let alone a good reason or a compelling reason, why the attorney/client privilege of the two Bermuda corporate entities should persist after their demise." However, this does not equate to the assertion that there "has never been any doubt" about plaintiffs' identities or that this issue may not again arise in the future.

¶ 80 Defendants further argue that the cases that appellants cite either support the "compelling reason" standard, such as in *Moran*, 802 F. Supp. 2d at 948-49, or rely on inapplicable statutes from the states in which the dissolved entities were formed. Defendants also contend that the attorney-client privilege does not survive a corporation's dissolution if there is no one with the authority to assert it. See *Affiniti Colorado, LLC v. Kissinger & Fellman, P.C.*, 2019 COA 147, ¶ 39 ("the 'trending majority view' in other jurisdictions follows the rule that the attorney-client privilege does not survive a corporation's dissolution if there is no one with the authority to assert it"). Defendants argue that, at the evidentiary hearing, plaintiffs were unable to elicit testimony regarding the authority of anyone to act on behalf of them after they were dissolved.

¶ 81 Defendants additionally take issue with appellants' public policy argument, asserting that plaintiffs failed to prove at the evidentiary hearing that the Bermuda entities were actively litigating the case and that none of the communications at issue involve any of their officers,

directors, or employees. Defendants argue that section 12.80 of the Business Corporation Act applies only to dissolved Illinois corporations. Defendants argue that, under the statute, dissolved Illinois entities might be able to satisfy the "compelling reason" standard during the five-year postdissolution civil remedy period, but not dissolved foreign companies like plaintiffs.

¶ 82        Whether a dissolved corporation may assert the attorney-client privilege has not yet been addressed in Illinois, but some other state and federal courts have examined this subject. We may look to decisions of foreign jurisdictions where Illinois has no authority on an issue. *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 68 n.2. The topic has been described as an "unsettled legal question" (see *In re Grand Jury Subpoena # 06-1*, 274 F. App'x 306, 309 (4th Cir. 2008)), but courts have also stated that "[t]he weight of federal authority supports a holding that there is a presumption the attorney-client privilege is no longer viable after a business entity ceases to function." *United States v. Walters*, No. 2:19-CR-51-KS-MTP, 2020 WL 1934803, at *2 (S.D. Miss. Apr. 21, 2020); see also *Express Homebuyers USA, LLC v. WBH Marketing, Inc.*, No. 18-60166-CIV, 2018 WL 4922467, at *2 (S.D. Fla. Feb. 9, 2018) (same); *Securities & Exchange Comm'n v. Carrillo Huettel LLP*, No. 13 CIV. 1735 GBD, 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) (same); *Official Moran*, 802 F. Supp. 2d at 948 (same). We agree with the analysis in the majority approach.

¶ 83        It is true that the attorney-client privilege is available to both individuals and corporations (*Upjohn Co. v. United States*, 449 U.S. 383 (1981)) and that the privilege survives an individual's death (*Swidler & Berlin v. United States*, 524 U.S. 399, 407 (1998)). The privilege extends beyond an individual's life because the client's knowledge that the communication will remain confidential even after death encourages the client to speak freely with counsel and not have to "be concerned about reputation, civil liability, or possible harm to friends or family." *Id.* These concerns cannot be applied equally to corporations because communications between current corporate managers and their attorneys are already subject to disclosure by future management, corporations do not have reputations to protect after dissolution, they do not have friends and family who could be embarrassed or harmed, and there are limitations periods for suing a dissolved company. *Affiniti Colorado, LLC*, 2019 COA 147, ¶¶ 33-34. Typically, a dissolved corporation has no assets or directors left, making the protections of the attorney-client privilege less meaningful. *City of Rialto v. United States Department of Defense*, 492 F. Supp. 2d 1193, 1200 (C.D. Cal. 2007); see also *Trading Technologies International, Inc.*, 2012 WL 874322, at *4 ("[w]hen the corporation is gone, so too is its interest in protecting its communications; the need to promote full and frank exchanges between an attorney and agents of his corporate clients disappears when the corporation employing those clients has departed"). Moreover, "[t]he possibility that a corporation's management will hesitate to confide in legal counsel out of concern that such communication may become unprivileged after the corporation's demise is too remote and hypothetical to outweigh the countervailing policy considerations supporting discoverability." *Gilliland v. Geramita*, No. 2:05-CV-01059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006). Limiting the duration of the attorney-client privilege to the life of a corporation is consistent with the principle that the privilege is to be construed narrowly because it withholds relevant information from the judicial process. *Carrillo Huettel LLP*, 2015 WL 1610282, at *3; accord *TAS Distributing Co.*, 2009 WL 3255297, at *2.

¶ 84    Additionally, the attorney-client privilege "is controlled, outside of bankruptcy, by a corporation's management." *Weintraub*, 471 U.S. at 351. A corporation is an artificial entity that always has to act through its agents (*Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 17), so whether to waive the attorney-client privilege must therefore be decided by management (*Express Homebuyers USA*, 2018 WL 4922467, at *2). However, the privilege belongs to the corporation itself, such that "[d]isplaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties." *Weintraub*, 471 U.S. at 349.

¶ 85    Whether a corporation can assert the attorney-client privilege depends on "whether the corporation is 'dead' as opposed to being in some other state, such as a windup phase, bankruptcy or liquidation, or having merged into or been acquired by a successor." *Red Vision Systems, Inc. v. National Real Estate Information Services, L.P.*, 2015 PA Super 5, 108 A.3d 54, 65; see also *Trading Technologies International, Inc.*, 2012 WL 874322, at *4 (a "company that has ceased normal business operations but is still going through the windup process, which can involve pursuing claims, is not 'dead' for purposes of the privilege," but a company that is completely defunct should not be allowed to maintain the privilege, whether or not it has technically maintained its legal status); *Lewis*, 2004 WL 3203121, at *4 (company was "dead" and could not assert the attorney-client privilege when it was bankrupt and had no assets, liabilities, directors, shareholders, or employees). In the latter situations, a person or entity succeeds the defunct company's interests and has the authority to assert the privilege, which is not the case if the corporation is defunct. *Red Vision Systems, Inc.*, 2015 PA Super 5, 108 A.3d at 65. In determining whether a corporation is dead, courts should look at practical business realities rather than technical legal status. *Moran*, 802 F. Supp. 2d at 949. In *Red Vision Systems*, the court held that

> "the communications between a corporation or other business entity and its attorney remain subject to the attorney-client privilege after the company dissolves and/or ceases normal business operations so long as the company retains some form of continued existence evidenced by having someone with the authority to speak for the 'client.' ***
>
> However, if a business is dissolved and/or has ceased to operate, and has neither a legal successor nor some remaining management with authority to handle the company's post-dissolution windup, then there is no longer any 'client' to raise or waive the privilege." *Red Vision Systems, Inc.*, 2015 PA Super 5, 108 A.3d at 68.

See also *Carrillo Huettel LLP*, 2015 WL 1610282, at *3 (a defunct corporation has no one who can speak for it to assert the privilege, and "once a corporation is truly extinct, it has lost practical ability to assert the privilege"); *Moran*, 802 F. Supp. 2d at 949 (a "corporation must also retain current management capable of asserting the privilege"); *Lewis*, 2004 WL 3203121, at *5 (the ability to waive the corporation's attorney-client privilege "rests with the corporation's management and is normally exercised by its officers and directors" (internal quotation marks omitted)); Restatement (Third) of the Law Governing Lawyers § 73 (2000) ("When a corporation or other organization has ceased to have a legal existence such that no person can act in its behalf, ordinarily the attorney-client privilege terminates ***.").

¶ 86    In this case, appellants admit that plaintiffs have been dissolved and have no officers, directors, or employees, with this lawsuit comprising their only remaining function. Appellants

- 19 -

assert that plaintiffs' status as parties in the suit requires that they be allowed to assert the attorney-client privilege. In *Moran*, the court stated that "[p]ursuing claims is a natural part of the windup process." *Moran*, 802 F. Supp. 2d at 950. However, as discussed above, a corporation must have a legal successor or management that can assert the privilege for it to apply.

¶ 87 The trial court highlighted this issue when it stated that the evidentiary hearing would cover "the identity of the plaintiff and the authority of whoever the plaintiff is determined to actually be to assert the privilege." Wieber stated that SEZC was asserting the privilege for plaintiffs, and the trial court replied that it wanted "a live body in the courtroom who can tell me that he or she represents the plaintiff in this case, has actual knowledge of who is asserting the privilege and by what authority." At the hearing, plaintiffs did not produce someone from SEZC as the individual with the authority to assert the privilege, nor did they enter admissible evidence showing that plaintiffs took action to have SEZC be able to assert the privilege for them. Instead, plaintiffs brought in Moes. The trial court ruled that Moes's testimony was hearsay because his knowledge was derived solely from reviewing documents and speaking to individuals; this ruling was not an abuse of discretion. See *Piser v. State Farm Mutual Automobile Insurance Co.*, 405 Ill. App. 3d 341, 350 (2010) (trial court has discretion in deciding whether statements are hearsay and whether they fall into an exception to the hearsay rule). Significantly, Moes was not part of plaintiffs' management, nor was there any evidence that he had any other authority to assert the privilege on plaintiffs' behalf. Plaintiffs therefore failed to show their "practical ability to assert" the attorney privilege. See *Carrillo Huettel LLP*, 2015 WL 1610282, at *3; *cf. Gilliland*, 2006 WL 2642525, at *4 ("Defendant cannot meet its burden to prove that the privilege has been validly asserted because there is no person with authority to properly invoke the privilege.").

¶ 88 The cases cited by plaintiffs are distinguishable because, as defendants point out (see *supra* ¶ 78), they rely upon inapplicable statutes from the states in which the dissolved entities were formed. See *PCS Nitrogen, Inc.*, 2011 WL 3665335, at *3 ("there must be some state statutory authority for the prolongation of a corporation's life beyond dissolution even for litigation purposes"); *Reilly*, 176 Cal. Rptr. 3d at 323-34 (relying on California state law); *Favila*, 115 Cal. Rptr. 3d at 298-99 (same); see also *Carrillo Huettel LLP*, 2015 WL 1610282, at *3 ("Cases that hold that the privilege survives the dissolution of a corporation generally do so on the basis of state law."). Similarly, section 12.80 of the Business Corporation Act is not at issue here, so we need not address if and how it would have affected our analysis of the attorney-client privilege. We additionally note that cases cited by appellants support our determination that a dissolved corporation must have someone with the authority to assert the attorney-client privilege. See *PCS Nitrogen, Inc.*, 2011 WL 3665335, at *4 ("a dissolved corporation could assert the attorney-client privilege where former directors or others properly exercise authority to do so"); *Favila*, 115 Cal. Rptr. 3d at 298-99 (company's ongoing management personnel should be able to assert the privilege).

¶ 89 Based on our determination that plaintiffs cannot assert the attorney-client privilege because they are dissolved entities and failed to show that they have a manager or other representative with the authority to assert the privilege on their behalf, we do not review the trial court's ruling that the crime-fraud exception to the attorney-client privilege also applied.

D. Contempt Order

¶ 91     Last, appellants argue that, regardless of our determination on the appeal's merits, we should reverse or vacate the contempt order and all of the fines imposed therewith. Appellants argue that Wieber requested the contempt order in good faith for the purpose of facilitating this appeal. They cite *Grant v. Rancour*, 2020 IL App (2d) 190802, ¶ 42, where this court vacated a contempt finding and the associated daily fine, based on our determination that the contemnor sought a friendly contempt order in good faith to obtain review of a discovery and sanctions order. See also *Allianz Insurance Co. v. Guidant Corp.*, 373 Ill. App. 3d 652, 678 (2007) (same). Appellants argue that the trial court recognized that the threshold issue here, whether a dissolved corporation can maintain the attorney-client privilege, is a question of first impression in Illinois, making an appeal of the trial court's ruling on the issue *per se* in good faith. They maintain that Wieber also had a principled basis in existing law to argue that the trial court erred when applying the crime-fraud exception to the attorney-client privilege and that he acted professionally and respectfully in requesting the contempt order.

¶ 92     Appellants analogize this case to *People ex rel. Birkett v. City of Chicago*, 292 Ill. App. 3d 745 (1997), which involved the same trial judge. There, we stated:

> "We understand the trial court's frustration that the orderly progression of this litigation was interrupted by the City's challenging discovery orders that we now agree were correctly entered. We cannot fault the court's basic objective of expediting discovery by utilizing contempt sanctions to enforce its orders. However, we find that the City's expression of willingness to submit to a contempt order, which could then be used as a means of appealing the City's question of first impression, demonstrates that the City's refusal to comply with the court's order constituted a good-faith effort to secure an interpretation of an issue without direct precedent in this state. [Citation.] The City was not contemptuous in the sense that the court was held in disdain or subjected to scorn. *** By subjecting itself to a contempt citation, the City exercised a permissible method of testing a pretrial order." *Id.* at 755-56.

Appellants argue that the trial court made the same error here. Appellants point to the trial court's comments that it had the "utmost respect for [Wieber] as a practitioner," that he was "a fine attorney," and that he was "outstanding in [his] advocacy." Appellants argue that, despite these comments, the trial court improperly focused on conduct predating Wieber's involvement in this case (including in Madison and St. Clair Counties) and proceedings in other forums, when Wieber was not counsel. Appellants contend that Wieber had a reasonable legal basis for pursuing this appeal and did so expeditiously, transparently, and respectfully, such that we should vacate the contempt order and the fine. Appellants alternatively argue that we should reverse the fine as draconian and excessive and remand for the trial court to enter a nominal amount.

¶ 93     Defendants argue that we should affirm the trial court's contempt finding because the record aptly supports its findings. They argue that appellants flouted the trial court's instruction to produce someone at the evidentiary hearing who could testify who the plaintiffs actually were and who was asserting the attorney-client privilege. Defendants argue that Wieber also took inconsistent positions in stating that he was following his clients' instructions but then stating that he could not produce any individuals from plaintiffs and that they could not be held in contempt, because they were dissolved entities. Defendants assert that the amount of the fine is also appropriate given that Wieber described his clients as multimillionaires or

- 21 -

billionaires and stated that his firm had already collected over $1 million from them in attorney fees during the sanction-related discovery proceedings. Defendants argue that this appeal is the latest front in a bad-faith litigation war waged by Ritchie against them and that we should put an end to it.

¶ 94 Whether a party is guilty of contempt is a question of fact for the trial court, and we will not disturb its finding unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion. *People v. Johnson*, 2017 IL App (1st) 162876, ¶ 13. We understand the trial court's frustration with the slow progression of discovery in this case and the concerns surrounding plaintiffs' identities. However, the circumstances that led the trial court to determine that the crime-fraud exception applied predate Wieber's involvement in the case, and even then, the trial court granted plaintiffs' motion to reconsider in part regarding its application of that exception. Additionally, whether the attorney-client privilege survives a corporation's dissolution is a question of first impression in Illinois. We agree with appellants that Wieber acted in a professional and respectful manner in asking for a "friendly" contempt finding to secure review of this issue and of the application of the crime-fraud exception. The record also shows that Wieber extensively researched the issues and discussed the repercussions of contempt with colleagues before declining to turn over the requested documents. A person may expose themselves to a contempt finding as an appropriate method to test the validity of a court order, and refusing to comply with a court's order may constitute a good faith effort to have a reviewing court interpret an issue without direct precedent. *In re Marriage of Paris*, 2020 IL App (1st) 181116, ¶ 63. " '[W]hen an attorney's noncompliance with a discovery order is based on a good faith effort to secure an interpretation of an issue to serve his or her client and the court, a civil contempt finding should not stand.' " *Grant*, 2020 IL App (2d) 190802, ¶ 42 (quoting *Doe v. Township High School District 211*, 2015 IL App (1st) 140857, ¶ 124). We believe that this is such a situation, so we vacate the contempt finding and the associated fine. *Cf. Birkett*, 292 Ill. App. 3d at 755-56. However, we note that plaintiffs are still subject to significant sanctions in the underlying proceeding.

¶ 95                                  III. CONCLUSION

¶ 96 For the reasons stated, we affirm the trial court's ruling that plaintiffs may not assert the attorney-client privilege, because they are dissolved corporations and failed to show that they have a manager or other representative with the authority to assert the privilege on their behalf. We vacate the trial court's contempt finding and associated fine, and we remand the cause for further proceedings.

¶ 97 Affirmed in part and vacated in part.

¶ 98 Cause remanded.